STATE of Missouri, Respondent,

v.

William R. JONES, Jr., Appellant.

No. 69153.

Supreme Court of Missouri,
En Banc.

April 19, 1988.
Rehearing Denied May 17, 1988.

Sean D. O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BLACKMAR, Judge.

This is another in the agonizing series of capital punishment cases falling within our mandatory jurisdiction under Mo. Const. Art. V, Sec. 3. The defendant was charged with first degree murder (§ 565.020, RSMo 1986) in the killing of Stanley Albert and was sentenced to death following a jury verdict in the bifurcated trial required by law. He assigns thirteen points of error on appeal. Finding nothing requiring reversal, and concluding that the sentence is not inappropriate under the standards of § 565.035(3), we affirm the conviction and the sentence.

The defendant does not challenge the sufficiency of the evidence and so our recitation of the facts need not be lengthy. The evidence was essentially circumstantial, aided by numerous extrajudicial statements by the defendant. He was a bisexual person who was sometimes employed as a male stripper. He became acquainted with Stanley Albert, with whom he had a homosexual relationship, in late 1985. The defendant was 21 and Albert was in his fifties. In November of 1985 Albert purchased a white 1985 Camaro Z28. Beginning in December of 1985, the defendant told several people that his father was going to help him in acquiring a white Camaro. On Thursday, January 16, 1986 at 4:30 P.M. Albert pulled up in front of the defendant's apartment in his Camaro, apparently to keep a prior engagement. The defendant borrowed a blanket from his roommate and left with Albert in the car. He told his roommate that his new car had arrived. He said he was going to pick up some tires and didn't want to get the car dirty.

That same evening the defendant offered his roommate a ride in the Camaro, which was accepted. During the ride he crushed a pair of sunglasses, remarking that the owner would not need them anymore. He confirmed a tentative arrangement with a female acquaintance to drive her to Indianapolis in his "new car" the following Sunday. He left the apartment early the next morning, purchased a shovel with his roommate's credit card, and returned in the afternoon. He had the license plates which had previously been on Albert's Camaro, explaining that he had to give them back to the man who sold him the car and that his father was getting him new plates. He complained to his roommate that he was tired, saying, "well, it gets pretty tiring when you drag a dead man through the woods."

On Sunday, January 19, the defendant picked up his female acquaintance in Topeka, Kansas and they set out on the projected trip to Indianapolis. He was accosted by the Missouri Highway Patrol for speeding and successfully outran the police in a high speed chase through Lafayette and Saline Counties, during which he compared his companion and himself to Bonnie and Clyde. He abandoned the car at a farmhouse near Malta Bend and was apprehended about three and a half hours later. The car bore Johnson County, Kansas, license plates stolen off another car.

Albert did not report to work on Friday, January 17, and was not seen again. His body was found in a wooded area near Independence on March 2, 1986. The medical examiner estimated that he had been dead between two weeks and several months. The body was wrapped in a blanket identical in appearance to the one the defendant had borrowed from his roommate. Albert had been shot five times in the neck and chest. Three of the bullets had been fired from the same weapon and the other two could have been. No murder weapon was ever found. Shells of the same very common type were found in the defendant's apartment, along with a presentation watch belonging to Albert and Albert's license plates.

Other circumstances need not be detailed. The jury could have found a chain of circumstances entirely consistent with the defendant's guilt and inconsistent with any other reasonable hypothesis.

## I.—Voir Dire

The defendant argues that the prosecutor on voir dire sought to obtain an impermissible commitment from the prospective jurors that they would return a death verdict. The jurors were questioned individually in chambers for "death qualification." The prosecutor asked most jurors whether they could consider a death verdict, it appearing that the defendant was only 21 years of age and that the prosecution's evidence was purely circumstantial. The defendant's counsel asked for and was allowed a continuing objection to these lines of inquiry.

▪ The defendant cites civil and criminal cases holding that it is not proper on voir dire to seek a commitment as to the verdict a juror might vote for under hypothetical circumstances.[1] The questions asked in this case do not fall under the proscription of the authorities cited. The inquiry is narrow and the questions are phrased in terms of "are you willing to consider?" Any further criticism of the form of particular questions should have been the subject of a specific objection. The prosecution is entitled to inquire, both in aid of challenges for cause and to obtain information for the intelligent exercise of peremptories, about the jurors' willingness to consider the specific circumstances objected to. *See State v. Antwine,* 743 S.W. 2d 51 (Mo. banc 1987). The court properly permitted the questioning.

▪ The defendant also complains of the inquiry as to whether the jurors would require more than proof beyond reasonable doubt before considering a death sentence.

---

1. *State v. Katz Drug Company,* 352 S.W.2d 678 (Mo. banc 1961); *Littell v. Bi-State Transit Development Agency,* 423 S.W.2d 34, 38 (Mo.App. 1967); *State v. Wilkerson,* 616 S.W.2d 829 (Mo. banc 1981).

No specific objection to any question along this line was presented. Specific objections are particularly important during voir dire because the general rule calls for allowing interrogating counsel broad latitude, and the actual prejudice from any particular question is difficult to assess. If objection is made the question may be reframed and any needed caution given. We perceive no error, plain or otherwise, in the interrogation. The questioning about reasonable doubt is an entirely proper inquiry as to whether the prospective juror is willing to follow the court's instructions. It is comparable to the question often asked by defense counsel as to whether a juror would be disposed to find a defendant who did not testify guilty. This does not amount to a prohibited attempt at commitment.

■ The defendant next protests about the sustaining of the state's challenges for cause to numerous jurors, citing *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed. 2d 581 (1980). It is appropriate to note at the outset the usual rule that error may not be predicated on the sustaining of a challenge for cause if a full panel of qualified jurors is tendered for peremptory challenge.[2] Otherwise the trial judge would be placed in an impossible position, especially since our decisions encourage trial judges to excuse challenged jurors freely when arguable grounds are presented.[3] *Witherspoon* provides an exception to the general rule in its holding that there is error in excusing a juror in a capital case simply because of scruples against the death penalty. The decision does not stand in the way of excuse for other substantial grounds, in death cases or otherwise.

■ The defendant objects to the excusal of jurors Drake, Davis and Cordell. The record indicates that these jurors were not excused because of their expressed views on the death penalty. Drake was crying at one point and said that she was

"about to fall apart." Juror Davis testified that "somebody here is playing with my mind," and the court felt that his testimony displayed such instability that he should not serve. Cordell did not express opposition to the death penalty "as long as there is positive proof," but "I'm not sure I could emotionally take the stress." The court excused her, expressing the thought that, because of her age (68) and professed emotional state it would be better to sustain the state's challenge. These three challenges represent appropriate exercise of judgment. The court may excuse jurors who give indication of lack of emotional stability, especially when a long trial with a sequestered jury is in prospect. The questioning does not indicate that these jurors were necessarily favorable to the defense. We are poorly equipped to question the trial court's exercise of judgment.

The defendant alleges error in the sustention of ten challenges for cause because of expressed views on the death penalty. It is argued that these excuses violated the *Witherspoon* test and that the court took an erroneous view of *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985), which expressed the proper test in terms of the trial court's conclusion that the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

*Witt* in this sentence, with the use of a quotation borrowed from *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), sought to "clarify" *Witherspoon*. It did not put an end to all problems about excusing jurors because of their views on capital punishment. In *Witt* a federal court of appeals had set aside a conviction because the trial court had excused a juror who answered questions about whether her scruples about capital punishment would interfere with her judging the guilt or innocence of the defendant by saying, "I am afraid it would" and,

---

**2.** *State v. Bannister*, 680 S.W.2d 141 (Mo. banc 1984), *cert. denied* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985), *see generally*, 47 Am.Jur. 2d 222.

**3.** *State v. Hopkins*, 687 S.W.2d 188, 190 (Mo. banc 1985).

later, "I think it would." The defense made no attempt at rehabilitation, and did not object to the excusal.

■ We pretermit consideration of the defendant's protest about the excusal of jurors Watson, Wilkins, Witt, Walker and Casebolt because defendant did not object to their being excused and did not preserve the point in his motion for new trial. The trial court is entitled to know the defense's position on a challenge for cause before the juror is irretrievably released. Ruling on *Witherspoon–Witt* challenges, as on challenges in general, is a very difficult matter. Counsel should not set traps for the trial judge. The proceedings as to these five jurors, just as the entire voir dire, demonstrates a conscientious effort to apply the law and a series of reasoned rulings. We will not second guess the trial judge on these when the defense did not. *State v. Mallett*, 732 S.W.2d 527 (Mo. banc 1987).

■ As to the remaining five excusals, the issue is not so simple as in *Wainwright v. Witt*. When jurors are challenged by the prosecution on the basis of their expressed views on capital punishment, it should be remembered that a violation of the *Witherspoon–Witt* standard, even as to one juror, may lead to reversal.[4] A single vote against a death sentence is no longer so damaging to the prosecutor's cause as it once was, for a dissenting juror no longer may hang the jury at the punishment phase. Sec. 565.030(4)(4).[5] We conclude, none the less, that the court did not err in excusing jurors Hickman, Young, Heffron, McDaniel and Williams, as to whom the defendant has properly raised and preserved claims of error.

■ Hickman was questioned at length by counsel and by the court. She said that she was not opposed to the death penalty, but that she would require "overwhelming evidence" of guilt rather than "proof beyond a reasonable doubt," and that if the state had no eyewitnesses she would be inclined to vote for a life sentence. The trial judge initially overruled a challenge

for cause but then, after further extensive questioning and a reading of *Witt*, expressed the conclusion that she had "waffled," and that "she would find it very hard to be a fair, unbiased, impartial juror." His conclusion appears to be within the language of *Witt*, even though the factual situation is substantially different. We defer to the trial judge's conclusion and reject the claim of error.

■ McDaniel, when questioned by the prosecution, said that she would automatically vote for life imprisonment over death. When the defense asked her if she would consider a death sentence because the law required it she said that she would "have to," and could consider both punishments. On further examination by the prosecutor, she said, "... I just really—I couldn't—put nobody to death." When defense counsel continued, she said she could consider the death penalty as a form of punishment "in some cases." Her final answer to the prosecutor was:

Q Okay. So you are telling us that if you were a juror you would be able to consider sentencing a person to death?

A Yes, if they had committed the crime, but still that's kind of—no; I couldn't do it. (Tr. 213)

The court "reluctantly" overruled the state's challenge for cause but later reconsidered and sustained the challenge. McDaniel seemed to express varying opinions, depending on who was questioning her, but her final answer, changed as she spoke, supports the trial court's ruling. When a juror gives flatly inconsistent answers the judge may properly consider her demeanor and decide which answer most accurately presents her views.

■ Williams first said that she could consider the death penalty, but, when the court later inquired about whether any jurors had any reservations about what they had previously said and provided opportunity for further questioning in chambers, she said that she had reconsidered and had come to the conclusion that she could not

---

4. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

5. This was not the case at the time the trial was held.

vote for the death penalty. Her final answer to defense counsel was that she did not consider the death penalty proper in any case. The court was certainly justified in accepting this answer, coming after she had reflected on the matter, and in sustaining the challenge for cause.

■ Heffron also indicated during her initial interrogation that she could vote for the death penalty, but she then accepted the court's invitation for further inquiry, and said that she could not do so unless there was an eyewitness. The court concluded that she had expressed an unwillingness to follow the instructions and excused her for cause.

■ Young said that she could not vote for a death sentence unless the proof were "very, very strong," and, in response to the questions, gave no assurance that she could apply the standard of reasonable doubt in the guilt phase. She indicated that she could not sign a death sentence verdict as foreman. The court excused her, observing that "she's an indecisive person and her demeanor was such that I just don't believe that she would follow the court's instructions on the law." There is basis for that conclusion in her voir dire testimony.

The court explained his reasons for sustaining the state's challenge to the five jurors. We find his explanations helpful, and indicative of a careful attempt to apply the *Witt* standard. *Witt* qualifies *Witherspoon* in allowing the judge to evaluate jurors' answers and to exclude those who equivocate as to whether they are able to consider the death penalty by the standards the law imposes. This holding undoubtedly acts to the prosecution's benefit in allowing the excuse of potentially adverse jurors.[6]

■ The defendant complains of the trial court's overruling of a challenge for cause to venireperson Donald White, who answered a question by defense counsel as follows:

Q [By defense counsel Morgens:] Do you feel that you would be inclined towards the death penalty if you found Mr. Jones guilty of that particular charge?

A Yes.

The court then intervened, and the colloquy proceeded:

THE COURT: The other side of one of Mr. Peters' questions is do you feel as if you could realistically consider life imprisonment without parole if you found Mr. Jones guilty of the murder in the first degree as I described it to you?

A Yes.

Q (By Mr. Morgens) You could consider that as a possible punishment?

A Yes.

Q Would you be willing to base your decision on the facts of the case as you hear them and the law as the Court gives it to you, and not be inclined towards one punishment or the other until you heard all the case?

A Yes (Tr. 561–562).

The court did not err in overruling the challenge. The interrogation was not prolonged. The juror clearly stated that he was willing to consider both alternatives. Although the court should be quick to sustain a challenge to a juror who demonstrates a substantial bias in favor of the death sentence, here the court was entitled to evaluate the juror's initial response and his subsequent answers. The court excused several jurors over the prosecution's protest because they indicated predisposition in favor of the death penalty. This juror's first response might be valuable to the defendant in the exercise of peremptory challenges, but the interrogation, taken as a whole, does not establish disqualification from service.

The trial judge showed great patience and diligence in the lengthy voir dire, which consumed two volumes and several hundred pages of transcript. The trial judge's helpful comments show objective grounding for each of the rulings properly brought before us. All of those excused

---

**6.** Although the excuses appear to meet the test of *Witt*, the writer, had he been the trial judge, would probably have overruled the challenges to Hickman and Young, in superabundance of caution, and especially in view of § 565.030(4)(4).

gave answers which indicated that they were not willing to abide by the standard the law imposes. There was no wholesale exclusion of jurors who had conscientious scruples, as in *Witherspoon,* or of those who were unwilling to swear that the mandatory punishment of death or life imprisonment would not affect their deliberations, as in *Adams.* We are not persuaded that there was error.

## II.—Trial Error

■ The defendant complains that Robert F. Booth of the Kansas City Police Department was allowed to testify about his comparison of soil samples from the area in which Albert's body was discovered with soil residue found on gloves traced to the defendant, even though Booth was not trained in geology or mineralogy. Booth had a bachelor's degree in chemistry and seven years experience with the police crime laboratory, during which he had conducted twenty-four soil comparisons. He said that he was a "trace chemist," and that soil analysis was a part of the work of persons in that profession. He had also had a short course on microscopic soil analysis. His qualifications were such that the court surely had discretion to admit his testimony, which simply went to the point that the two samples could have had a common origin.[7] The weight, of course was for the jury.

■ A similar complaint was about the testimony of Dr. Bonita J. Peterson, medical examiner, as to the possible position of Albert's body when he was shot. The defense protests that she was asked to use her common sense and not her skill as a pathologist. She was questioned further about her qualifications after the objection. The court felt that her vast experience as a forensic pathologist qualified her to testify about possible positions of the gunman and the victim. The testimony was properly received under the authorities cited above and is not rendered objectionable simply because the witness was asked to use common sense. The evidence, furthermore, was not particularly damaging because it was confined to possibilities.

■ The defendant also objected to the production of a card showing Albert's fingerprints, which was presented by a police officer but actually was a record of the city's department of liquor control. He protests that the testifying officer was not the custodian of this record and could not testify as to its manner of preparation.[8] Prosecutors should be careful to see that all documentary evidence is properly authenticated by a competent witness. The card, however, contained the victim's signature, verified by his ex-wife, and gave an appearance of authenticity. It was offered solely as means of identification of the body and not as a circumstance probative of guilt. The body was also identified by the former wife, and so the evidence objected to is essentially cumulative. The point does not require reversal.

The prosecutor caused three charts to be marked as exhibits. On these he listed circumstances in evidence testified to by witnesses. He would ask some witnesses to repeat significant circumstances disclosed by their testimony, and would then ask them to initial the charts. The defense objected to the repetition. Particular complaint is made that the defendant's roommate was allowed on redirect examination to repeat his identification of the blanket borrowed from him in which Albert's body was wrapped when it was found, even though the defense counsel had not asked questions on cross-examination about the blanket. The blanket, however, was mentioned during cross-examination.

The trial judge initially admitted the three charts in evidence but then reconsidered his ruling after examining *Matter of Estate of Passman,* 537 S.W.2d 380, 385–6 (Mo. banc 1976), and sustained the defense's objection. He allowed reference to

---

7. The decision to admit or exclude expert testimony is one left to the discretion of the trial court. *State v. Jones,* 594 S.W.2d 932, 938 (Mo. 1980); *Dunkin v. Reagon,* 710 S.W.2d 498 (Mo. App.1986).

8. Section 490.680, RSMo 1986.

the charts during closing argument and counsel for the defendant had frequent resort to them in arguing that the circumstances relied on by the state were not significant.

 There is no error. It is not unusual to permit repetition of salient points of the witness's testimony in direct or redirect examination, especially in circumstantial cases. The matter is manifestly one for discretion. *Passman* made it clear that summaries of testimony may be used as aids to memory so long as they are not admitted into evidence. The allowing of a question on redirect as to something not covered in cross-examination is also a matter of discretion, analogous to allowing the recall of a witness for further direct. Full cross-examination on the new matter is available and there is no error.

*State v. Seever,* 733 S.W.2d 438 (Mo. banc 1987), cited by the defense, is not in point. There we found error in allowing a witness whose credibility went to the very heart of the case to testify from the stand, after a videotape recording of her statement to a police officer, covering substantially the same subject matter, had been presented. We held that the dual presentation to the jury might have an unreasonable bolstering effect. That case did not foreclose the presentation of the circumstances relied on by the prosecution in an orderly manner, by witnesses who had previously testified to their existence. *See State v. Harris,* 711 S.W.2d 881 (Mo. banc 1986), which emphasizes the scope of the trial judge's discretion as to repetitive matters.

### III.—The Punishment Phase

 Two witnesses testified at the punishment phase about the defendant's prior criminal conduct which did not give rise to convictions. The testimony was not objected to. The defendant now argues that the trial judge should have excluded

this evidence *sua sponte.* We do not agree. Some of the evidence may have been hearsay, but hearsay evidence may be received and used in support of findings if there is no objection.[9] The defendant's roommate testified that the defendant had admitted an Arkansas burglary to him, and the defendant himself admitted having entered his girlfriend's father's safe, and so the incidents were established by evidence which is not hearsay. The jury at the punishment phase is entitled to full information about the defendant and his previous conduct.[10]

The defense challenges the submission of statutory aggravating circumstances. The court submitted three aggravating circumstances, as follows:

1. Whether defendant murdered Stanley Albert for the purpose of the defendant receiving money or any other thing of monetary value from Stanley Albert. [Section 565.032(2)(4), RSMo 1986].

2. Whether the murder of Stanley Albert involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman. [Section 565.032(2)(7), RSMo 1986].

3. Whether the murder of Stanley Albert was committed while the defendant was engaged in the perpetration of or the attempt to perpetrate robbery.... [Section 565.032(2)(11)].

 The jury found the first and third of these, but not the second. The defendant complains that there is no evidence of robbery. This would not be fatal to conviction. Our cases consistently hold that, if the jury properly finds a single statutory aggravating circumstance, then a finding of another one is not prejudicial even though not supported by the evidence or otherwise infirm.[11]

 We conclude, furthermore, that both of the aggravating circumstances found are supported by the evidence. The

9. *Gerald v. Caterers, Inc.,* 382 S.W.2d 740, 743 (Mo.App.1964).

10. *State v. Schlup,* 724 S.W.2d 236 (Mo. banc 1987).

11. *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983); *State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983).

defendant clearly acted for the purpose of depriving Albert of possession of the Camaro and appropriating it to his own use for so long as he was not disturbed in his possession. He obtained a "thing of monetary value."

The jury could find, moreover, that the defendant did "forcibly steal" the vehicle, even though the evidence did not show exactly how he got Albert out of the picture and assumed possession himself. It is not necessary that the victim be aware that he is being robbed.[12] The jury could infer that the shooting was an essential step in the defendant's taking possession of the car.

■ The defendant goes on to argue, however, that there was prejudicial error in submitting both of these circumstances to the jury in Instructions 18, 19 and 20, based on MAI–CR3d 313.42, 313.44 and 313.46. He contends that the two circumstances cover essentially the same conduct and that there is an impermissible "doubling" effect in telling the jury that it may weigh both of them against such mitigating circumstances as it might find, in determining whether the aggravating circumstances outweigh the mitigating. We do not agree. The first and third circumstances are related, but they emphasize different facets of criminal activity. The first one has to do with the defendant's greed, and the third with the use of force. Both are amply established in the setting of this record. The submission was in accordance with the law. There is no reason to consider what the situation would have been if one of the circumstances had been found to be improperly submitted.

■ The defense claims that the court should have intervened *sua sponte* when the prosecutor tried to argue the good character of the victim, citing *Booth v. Maryland*, — U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Counsel has to present

the point in this manner because no objection was taken. There is no plain error. The defendant had referred to Albert's asserted homosexuality in his argument, and so the state's response might be characterized as retaliatory. The comparison to *Booth* is not appropriate. There the state, over objection, was allowed to read a detailed account about the effect of the murder on the victim's family, including such items as the interference with wedding plans. The Court found that the sole purpose of this evidence was to inflame the jury, and criticized a statutory provision for "victim impact" statements. Here the passages were relatively brief and were confined to the record. The arguments, both at the guilt phase and the punishment phase, were not unduly inflammatory. The absence of objection is fatal to the defendant's claim.

The last point is in aid of our mandatory proportionality review. The case was fairly tried, and we find no indication that the verdict was tainted by passion or prejudice.

■ Nor do we find that the sentence was disproportionate. The defendant was comparatively young, 21, but death sentences against younger defendants have been upheld. *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982); *State v. Battle*, 661 S.W.2d 487 (Mo. banc, 1983); *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984); *State v. Wilkins*, 736 S.W.2d 409 (Mo. banc 1987).[13] The evidence of guilt, though essentially circumstantial, was very strong. The defendant had prior convictions for burglary and assault and the evidence properly showed other serious misconduct.

■ The defense cites cases which it considers to be much more aggravated than this one and in which juries in their wisdom have not decreed the death penalty.[14] The cases cited, though very aggravated, do not demonstrate the extended deliberation which characterizes this one.

---

12. *State v. Lora*, 561 S.W.2d 728, 729 (Mo.App. 1978).

13. The writer dissented in the last three of these cases, but now defers to them as established law.

14. *State v. Tate*, 731 S.W.2d 846 (Mo.App.1987); *State v. Wirth*, 715 S.W.2d 4 (Mo.App.1986); *State v. Allen*, 710 S.W.2d 912 (Mo.App.1986).

Under our decisions, furthermore, only relative proportionality is required.[15] A death sentence does not have to be set aside simply because the jury decreed life imprisonment in what might seem to be a more aggravated case.[16] This defendant willfully murdered a person who had done nothing to provoke him, simply to satisfy his urge to possess a sports car. He plotted his course of action over a period of several weeks. It is hard to imagine a clearer example of a deliberate homicide. To one who believes in capital punishment, this is a strong case for the ultimate sanction. There is no hint of impaired mental capacity. *Cf. State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982). The case is comparable to *State v. Bannister,* 680 S.W.2d 141 (Mo. banc 1984), *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984), and *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982). *See also State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987), involving a killing in order to acquire an automobile.

The judgment is affirmed as to conviction and sentence.

BILLINGS, C.J., and DONNELLY, WELLIVER, ROBERTSON and HIGGINS, JJ., concur.

RENDLEN, J., concurs in result.

---

**15.** *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981). The writer has spoken out in favor of a more thorough proportionality review. *See State v. McDonald,* 661 S.W.2d 497 (Mo. banc 1983) (Blackmar, J., dissenting); *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983) (Blackmar, J., dissenting).

**16.** The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of similar cases as a whole. *State v. Mallett,* 732 S.W.2d 527, 542 (Mo. banc 1987).