STATE of Missouri, Respondent,

v.

Ed Theodore REUSCHER, III, a/k/a
Butch Reuscher, Appellant.

No. 73463.

Supreme Court of Missouri,
En Banc.

Feb. 25, 1992.

As Modified on Denial of Rehearing
March 24, 1992.

Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Judge.

Appellant, Edward Theodore Reuscher, III, appeals his conviction of murder in the first degree under § 565.020, RSMo 1986, for which he was sentenced to death. Affirmed.

The evidence, viewed in the light most favorable to the verdict, *State v. Guinan,*

665 S.W.2d 325, 327 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984), supports the jury's finding of guilt. At around 2:00 a.m. on December 19, 1989, Edward Reuscher, John Corbett, and three female companions, using a vehicle owned by Jeff Newberry, drove to 3614 St. John in northeast Kansas City. When they arrived, Reuscher exited the vehicle and went to the door of the residence located at that address. Ricky Elmore came to the door. The two men quarrelled. Elmore slammed the door on Reuscher. Elmore went to get a torque wrench, then chased Reuscher, who ran back to the vehicle. Elmore hurled the wrench at the car as it departed, breaking the back window. Elmore reported the incident to the police.

Corbett and Reuscher dropped off the three women then went to find Jeff Newberry. After locating Newberry, the three men went to Ron Orrick's apartment, number 13 in the Knollwood Apartment complex, at 1411 Northeast Vivion Road in Clay county, in search of their friend Ken Melton.

Finding the apartment unlocked, Reuscher, Corbett, and Newberry went inside. Melton was not there but Robert Wood, an acquaintance, was asleep on the living room floor. Reuscher apparently disliked Wood because he thought Wood was homosexual. The men awakened Wood to ask him whether he knew where Melton was. Wood said he did not know. The men told Wood that his black Thunderbird automobile was not parked outside and then inquired as to its location. When Wood was unable to locate his car keys in his pockets, he told the men he did not know where his car was. Wood then went back to sleep.

Reuscher, Corbett, and Newberry left the apartment and went in search of Melton. They found Melton driving Wood's car on a nearby street. All four men returned to the Knollwood Apartments to drop off Wood's car.

Corbett then drove Reuscher, Newberry and Melton to Dan Tyler's residence so that Melton and Reuscher could obtain Reuscher's shotgun and shells. The four men returned to Elmore's residence in northeast Kansas City to "get even" with Elmore for breaking the window of Newberry's car. On the way, Reuscher, Melton and Newberry consumed whiskey.

The four men arrived at Elmore's house at approximately 4:00 a.m. and parked the car a few houses down the street. All four men exited the vehicle. One man ran to Elmore's car and began to break the windows. Elmore ran from his house with a baseball bat to confront them. When Elmore noticed that the man breaking his car windows carried a pistol, he stopped and shouted, "No guns." Elmore then turned to his left and saw Reuscher with a shotgun. Elmore again yelled, "No guns," and ran in the direction of his house. Reuscher shot Elmore in the buttocks as he fled. Elmore fell on his porch and was dragged inside the house by his friend, Jerry Robinson.

Reuscher and his friends ran back to the vehicle and drove away. Robinson chased the car in an effort to obtain the license number of the vehicle. Reuscher shot at him. The bullet went astray and struck a woman who was walking her dog.

Reuscher, Melton, Corbett, and Newberry returned to the Knollwood Apartments. When they entered apartment 13, Wood remained asleep on the floor. Melton and Reuscher took Wood's car and went to the store. After they returned to the apartment with refreshments, Reuscher and Melton discussed the possibility of going to Florida. Corbett and Newberry decided to leave. All four men went outside. Before Corbett and Newberry left, someone removed the shotgun from Newberry's vehicle and placed it in Wood's Thunderbird.

A neighbor reported to the police loud thumping sounds emanating from apartment 13 between 4:30 and 5:00 a.m. From her window the neighbor saw Reuscher retrieve a long thin object from the back seat of a dark-colored car and return to the building. She heard more commotion from apartment 13 and, finally, a loud crash and the sound of shutting doors. She looked from her window again and this time observed Reuscher and Melton enter the dark

colored vehicle and drive away. The police arrived shortly thereafter. When they received no response at apartment 13, they left.

At 9:00 a.m. the neighbor telephoned the landlord to report the disturbance. The landlord sent two maintenance men to apartment 13 to investigate. They discovered Mr. Wood's body and notified the police.

When the police arrived, they found Wood's body lying on the living room floor clothed in underwear. A fire extinguisher and a broken television set, both blood splattered, were found near the body. The police also found a liquor bottle near the body.

Wood sustained multiple head injuries, the most serious of which were a skull fracture caused by a pipe and a crush injury across the face caused by a cylindrical object, such as a fire extinguisher or a whiskey bottle. Wood suffered a blow to his chest, as well as multiple stab wounds in the chest and one in the testicles. His throat was slit. Forensic evidence conclusively showed that Wood died from the head wounds.

After murdering Wood, Melton and Reuscher fled the Knollwood Apartments. While driving down Highway 69, Melton lost control of the car and crashed into a guardrail. The men proceeded on foot.

After being told by a citizen about an accident on Highway 69, Officer Handley of the Claycomo police department went to investigate. A citizen at the scene told Handley that he had seen two people covered with blood running down Park Street, a road running parallel to Highway 69. Handley radioed Officer Jewell, the other officer on duty, advising him to look for a couple of injured people.

Officer Handley returned to the Thunderbird to search for information that would indicate ownership of the vehicle. In the course of his search, the officer uncovered a shotgun and a two-foot long stainless steel pipe, both of which were covered with specks of blood. Handley notified Officer Jewell of his discovery.

Officer Jewell apprehended Reuscher and Melton nearby. A dispatcher advised the officers that one of the suspects was probably Ed Reuscher and that the Kansas City police wanted to talk to both Reuscher and Melton in connection with the incident that occurred at the Elmore residence earlier in the morning.

At that point, the officers read Reuscher and Melton the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When the Kansas City police arrived, the officers transferred Reuscher and Melton to the Kansas City police department's vehicle. Melton told the police he needed to talk to an officer. A Kansas City officer assured him that he could talk to someone downtown. Reuscher instructed Melton to keep his mouth shut. Later that afternoon, after again receiving *Miranda* warnings, Reuscher provided a confession. He claimed that Melton had initiated the attack upon Wood with a fire extinguisher; Reuscher admitted to having hit Wood in the head and in the chest with a pipe and to having kicked Wood in the head.

The jury found Reuscher guilty of murder in the first degree under an accomplice theory of liability based on §§ 562.036 and 562.041, RSMo 1986.

During the penalty phase, the state introduced evidence regarding a forcible sodomy committed by Reuscher against a fifteen year old boy. The state also introduced evidence of two convictions for assault in the second degree which arose out of the shootings that occurred at Elmore's residence on December 19, 1989. Reuscher's parents testified on behalf of their son. The jury found that five of the seven aggravating circumstances submitted by the state were proved beyond a reasonable doubt and recommended the death penalty.

█ Appellant raises three points on appeal. The first concerns the venire. During voir dire the prosecutor asked several venirepersons whether the fact that the crime with which appellant was charged carried a possible sentence of death would cause them to require the state to prove guilt by a standard higher than proof be-

yond a reasonable doubt. Four of the venirepersons, Mr. Logan, Mr. St. John, Mr. Williams, and Ms. Ball, unequivocally stated that they would require the state to prove appellant's guilt absolutely and beyond any possible doubt. Mr. Logan expressed a need for "absolute" proof; Mr. St. John expressed a need for "total" proof, "beyond any doubt whatsoever"; Mr. Williams required proof "beyond any shadow of a doubt"; and Ms. Ball expressed the need for the state to prove guilt "beyond any possible doubt." Mr. St. John, Mr. Williams, and Ms. Ball additionally stated that they would hold the state to a higher standard of proof in the penalty phase, as well as the guilt phase, of the trial. The prosecutor moved to strike venirepersons Logan, St. John, Williams, and Ball for cause. The defense objected. The court sustained the state's motion, finding that it appeared that none of the four venirepersons could follow the court's instructions with regard to the standard of proof, which would prevent or substantially impair their performance as jurors.

Appellant alleges that the trial court erred in sustaining the state's challenges for cause, thereby depriving appellant of due process of law and a fair and impartial jury. Appellant relies on *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which held that the Sixth and Fourteenth Amendments to the United States Constitution forbid imposition of the death penalty if the jury that imposed or recommended the penalty was selected by excluding venirepersons for cause solely because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. *Id.* at 522, 88 S.Ct. at 1777. Appellant correctly recognizes that the United States Supreme Court clarified *Witherspoon* in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which holds that a prospective juror may be excluded for cause if the juror's views on capital punishment would prevent or substantially impair the performance of the juror's duties in accordance with the instruction and oath. *Id.* at 424, 105 S.Ct. at 852; *see also State v. Antwine*, 743

S.W.2d 51, 60 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

Appellant's reliance on the *Witherspoon/Witt* line of cases is questionable at best. The venirepersons excused from appellant's panel were not excluded as a consequence of their views on capital punishment; each was excluded because each expressed unwillingness to convict unless the state proved appellant's guilt absolutely. None of the four expressed reservations about imposition of a death penalty; to the contrary, each acknowledged that it was a "necessary law."

■ When a venireperson in a case in which the death penalty may be imposed is excluded for reasons unrelated to the person's scruples against the death penalty, the appropriate rule is that error may not be predicated upon the sustaining of a challenge for cause if a full panel of qualified jurors is tendered for peremptory challenges. *State v. Jones*, 749 S.W.2d 356, 360 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 155 (1988) (citation omitted). Nothing in the record of this case suggests that the tendered panel was not qualified; thus, no error resulted from the removal of the four venirepersons at issue. The prosecutor's questions regarding the state's standard of proof constituted a proper inquiry into the willingness of the prospective juror to follow the court's instructions. *See Id.*

■ Even assuming, *arguendo*, that the excluded venirepersons' responses to questions regarding the state's standard of proof could be characterized as expressions of scruples about the death penalty, exclusion of the venirepersons was nonetheless justified. *Witt* makes clear that where a venireperson's scruples would interfere with adjudicating the guilt or innocence of the accused, the venireperson may be excluded for cause. *Wainwright v. Witt*, 469 U.S. at 416, 430–35, 105 S.Ct. at 855–58. In the present case, the venirepersons' inability to convict in the absence of absolute proof interfered with their ability to adjudicate guilt.

■ Similarly, the state is entitled to remove for cause any venireperson whose views on capital punishment would prevent the venireperson from applying the law as charged by the court. *See Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio,* 438 U.S. 586, 595–96, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978). This Court has previously determined that a venireperson's refusal to apply the reasonable doubt standard to the guilt phase of a capital murder case is tantamount to a refusal to apply the law as charged by the court. *See State v. Jones,* 749 S.W.2d at 361–63. The trial court's conclusion that these particular venirepersons would not follow the court's instruction with regard to the state's standard of proof is entitled to deference. *Wainwright v. Witt,* 469 U.S. at 428, 105 S.Ct. at 854; *State v. Jones,* 749 S.W.2d at 361; *State v. Antwine,* 743 S.W.2d at 60–61. The trial court's conclusion is supported by the record. Appellant's claim is denied.

■ This Court is required by § 565.-035.3, RSMo 1986, to undertake independent review in order to determine:

(1) Whether the sentence of death was imposed under the influence of passion, or prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's findings of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Appellant fleetingly suggests that the verdict of death was a result of passion and prejudice because the jury was inflamed by the idea that appellant disliked Wood because appellant believed that Wood was homosexual, when appellant himself had been convicted of sodomy. Appellant's suggestion is speculative. The sole mention of appellant's possibly not liking Wood because of his sexual preference came in direct testimony by Corbett. The prior conviction was introduced at the penalty stage. No connection was made by the state either directly or by innuendo. Under its function of independent review this Court finds no basis for appellant's allegation. Nor does the Court identify any other basis upon which to find that the jury recommended the sentence of death under the influence of passion, prejudice, or any other arbitrary factor.

■ Although appellant does not contest the sufficiency of the evidence to support the jury's findings of aggravating circumstances, this Court independently reviews the jury's findings pursuant to § 565.035.-3(2). The jury found as aggravating circumstances that appellant had been convicted of four felonies, including sodomy, felonious restraint, and two counts of second degree assault, all of which were found by the trial court to be serious assaultive felonies. See § 565.032.2(1), RSMo 1986. Certified copies of the convictions admitted into evidence support the jury's findings.

■ The jury also found as an aggravating circumstance that the murder of Wood involved depravity of mind and was outrageously and wantonly vile, horrible and inhuman, *see* § 565.032.2(7), in that appellant, while killing Wood or immediately thereafter, purposefully mutilated or grossly disfigured the body of Wood by acts beyond those reasonably necessary to cause Wood's death. As the photographic evidence amply demonstrates, Wood suffered innumerable savage blows to the head. Appellant admitted having inflicted some of the blows to the head, while Wood was apparently near death but gurgling. There was also evidence from which the jury could reasonably have inferred that appellant, after inflicting a possibly fatal blow to the head with a metal pipe, left the apartment to retrieve a shotgun from Wood's car and returned to apartment 13 to beat Wood with the gun. The jury's finding of depravity of mind based upon the disfigurement of Wood's body is supported by the evidence.

■ Section 565.035.3(3) requires review of the sentence for proportionality, considering the crime, the strength of the evidence, and the defendant. The evidence in this case shows that appellant participated in a savage attack upon a sleeping man. The attack left Wood's oral and nasal structures completely shattered. Some of Wood's teeth were driven into the oral cavity, and some were torn out. Wood's jaws were fractured, as was his foramen magnum, which the medical examiner described as the main entrance of the spinal cord. Both eye sockets were crushed and both eye globes were ruptured. Blows to his head were struck with such force that fragments of Wood's skull were driven into his brain, and brain tissue protruded through a fracture in his skull. Wood suffered twenty stab wounds primarily in the neck and chest area. One stab wound penetrated the main chamber of his heart and several punctured his lungs.

This Court has examined first degree murder cases in which death and the alternative sentence of life imprisonment have been submitted to the judge or the jury and the sentence has been affirmed on appeal. The cases most similar to this case in that they involve depravity of mind based upon mutilation of the victim are: *State v. Feltrop*, 803 S.W.2d 1 (Mo. banc), *cert. denied*, — U.S. —, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *State v. Grubbs,* 724 S.W.2d 494 (Mo. banc), *cert. denied*, 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987); *State v. Wilkins*, 736 S.W.2d 409, 417 (Mo. banc 1987) *aff'd sub nom. Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Depravity found in part upon defendant's infliction of additional wounds upon mortally wounded victim); *State v. Jones*, 705 S.W.2d 19 (Mo. banc), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986) (Jury found torture, not depravity, but placed reliance upon post-mortem mutilation).

Appellant committed prior assaultive felonies leaving a sodomized child and two persons shot. Other first degree murder cases involving defendants with prior assaultive felonies include: *State v. Parkus*, 753 S.W.2d 881 (Mo. banc), *cert. denied*, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988); *State v. Chambers*, 714 S.W.2d 527 (Mo. banc 1986), *cert. denied*, — U.S. —, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990); *State v. Bannister*, 680 S.W.2d 141 (Mo. banc 1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985); *State v. Nave*, 694 S.W.2d 729 (Mo. banc), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986); *State v. Malone*, 694 S.W.2d 723 (Mo. banc), *cert. denied*, 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986).

The strength of the evidence against appellant is overwhelming. *See* § 565.035.3(3). Appellant's confession was independently corroborated by forensic evidence and by eyewitness accounts placing appellant at the scene of the crime. When apprehended by the police shortly after the crime, appellant was covered with blood. Police recovered blood-covered implements used in the beating of Wood from the car in which appellant had been riding.

■ Appellant alleges that his sentence is disproportionate because he was only eighteen years old at the time of the crime and because he acted merely as an accomplice in the crime. While appellant is correct in noting that his age and alleged lesser participation in the crime could be viewed as mitigating circumstances, these circumstances do not foreclose assessment of the penalty at death. *See State v. Kilgore*, 771 S.W.2d 57 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); · *State v. Walls*, 744 S.W.2d 791, 800 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Lashley*, 667 S.W.2d 712 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). After independent review, this Court concludes that the penalty imposed in this case is not disproportionate to the penalty imposed in similar cases consider-

ing the crime, the strength of the evidence, and the defendant.

 Again on the basis of his age and of accomplice liability, appellant contends that the imposition of the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. Contrary to appellant's assertion, execution of individuals for crimes committed at ages sixteen or seventeen does not offend against the Eighth Amendment. *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Nor does imposition of the death penalty after a finding of accomplice liability, so long as the accomplice kills, attempts to kill, or intends the killing to result. *See Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982). A conviction of capital murder in Missouri under a theory of accomplice liability requires the jury to have found that the defendant acted with or aided or encouraged another person for the purpose of committing the murder. § 562.041.1(2); *State v. Kilgore*, 771 S.W.2d at 68. The jury found that appellant possessed the requisite intent to commit murder. There is no Eighth Amendment violation.

 In his third and final point, appellant challenges the sufficiency of the verdict for the penalty phase. He claims the jury failed to find beyond a reasonable doubt one or more of the aggravating circumstances submitted to them. Appellant first objected to the verdict in his motion for a new trial, after discharge of the jury, and seeks plain error review under *Rule 30.20*.

There was no error, plain or otherwise. The court submitted seven aggravating circumstances to the jury through Instruction No. 17:

> In determining the punishment to be assessed against the defendant for the murder of Robert Wood, you must first unanimously determine whether one or more of the following aggravating circumstances exists:
>
> 1. Whether the defendant was convicted of Forcible Sodomy on July 19, 1990 in the Circuit Court of Clay County of Missouri.
>
> 2. Whether the defendant was convicted of felonious restraint on July 19, 1990 in the Circuit Court of Clay County of Missouri.
>
> 3. Whether the defendant was convicted of assault in the second degree of Ricky Ellmore on August 16, 1990 in the Circuit Court of Jackson County of Missouri.
>
> 4. Whether the defendant was convicted of assault in the second degree of Kelli Anson on August 16, 1990 in the Circuit Court of Jackson County of Missouri.
>
> 5. Whether the defendant murdered Robert Wood for the purpose of the defendant receiving money or any other thing of monetary value from Robert Wood.
>
> 6. Whether the murder of Robert Wood involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant, while killing Robert Wood or immediately thereafter, purposefully mutilated or grossly disfigured the body of Robert Wood by acts beyond that necessary to cause his death.
>
> 7. Whether the murder of Robert Wood was committed for the purpose of avoiding a lawful arrest of defendant. You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of the circumstance.
>
> Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Instruction No. 21, in relevant part, informed the jurors that "[i]f you unanimously decide, after considering all of the evidence and instructions of law given to you, that the defendant must be put to death for the murder of Robert Wood, your foreman must write into your verdict all of the aggravating circumstances submitted in Instruction No. 17 which you found beyond a reasonable doubt."

The penalty phase verdict form, as completed by the jury, read as follows:

### VERDICT

(Jurors: Use this form only if the punishment you now assess and declare is death. See Instruction No. 21 for directions as to what must be written on this verdict form. The foreman's signature must appear after the aggravating circumstance or circumstances.)

We, the jury, having found the defendant, Edward Reuscher, guilty of Murder in the First Degree of Robert Wood, now assess and declare the punishment at death. We have found the following aggravating circumstance or circumstances beyond a reasonable doubt:

(1) Whether the defendant was convicted of Forcible Sodomy on July 19, 1990 in the Circuit Court of Clay County of Missouri.

(2) Whether the defendant was convicted of Felonious Restraint on July 19, 1990 in the Circuit Court of Clay County of Missouri.

(3) Whether the defendant was convicted of Assault in the second degree of Ricky Ellmore on August 16, 1990 in the Circuit Court of Jackson County of Missouri.

(4) Whether the defendant was convicted of Assault in the second degree of Kelli Anson on August 16, 1990 in the Circuit Court of Jackson County of Missouri.

(6) Whether the murder of Robert Wood involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible and inhuman. You can make a determination of depravity of mind only if you find that the defendant, while killing Robert Wood or immediately thereafter, purposefully mutilated or grossly disfigured the body of Robert Wood by acts beyond that necessary to cause his death.

Appellant postulates error by arguing that the wording of the findings indicates the jury harbored questions regarding the aggravating circumstances listed by the jury and did not find them beyond a reasonable doubt. Appellant's argument is untenable in view of the instructions received by the jury. The court clearly instructed the jury that, unless the jury found at least one of the aggravating circumstances beyond a reasonable doubt, the jury was required to impose a sentence of life in prison. The verdict form explicitly directed the jury to list only those aggravating circumstances found by them beyond a reasonable doubt. The jury is presumed to follow the instructions. There is nothing of record to indicate that the jury disregarded the instructions. The fact that the jury completed the verdict form finding only five of the seven aggravating circumstances further belies appellant's contention.

Appellant nevertheless asks this Court to reject the jury's verdict relying on *State v. Archer*, 406 S.W.2d 563, 566 (Mo.1966), for the proposition that in order to be valid a verdict must be positive and free from all ambiguity, conveying on its face a definite and precise meaning which shows exactly what the jury intended. The argument fails. Even if a verdict is ambiguous, the verdict is not erroneous if the meaning of the verdict can be determined with certainty from the record. *See Id.* While it is better practice for the trial court to return the jury for further deliberations if a verdict is returned in an improper form, failure to do so does not necessarily invalidate the verdict. Verdicts are not to be tested by technical rules of construction. *State v. Lewis*, 491 S.W.2d 326, 328 (Mo. 1973). "The overriding objective is to ascertain the intent of the jury. If the jury's intent is clearly discernible, the verdict is good though it may be irregular in form." *State v. Ledford*, 550 S.W.2d 871,

874 (Mo.App.1977). The rule applies, as well, to cases involving the penalty of death. If the intent to impose a penalty of death is clear and the aggravating circumstance upon which that determination was made is sufficiently identified, a death sentence may stand. *See e.g., State v. Jones,* 705 S.W.2d 19, 22 (Mo. banc), *cert. denied,* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Nave,* 694 S.W.2d 729, 737 (Mo. banc 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986).

The written findings of the jury identified the aggravating circumstances that the jury found beyond a reasonable doubt, precisely as Instruction No. 21 required. Instruction No. 21 did not instruct the jurors to remove the word "Whether." The jurors' literal compliance with the instructions reflects their clear intent to recommend the death sentence based upon the five aggravating circumstances listed on the verdict form. The verdict was sufficient.

The judgment and sentence are affirmed.

ROBERTSON, C.J., and RENDLEN, HOLSTEIN, BENTON, and THOMAS, JJ., concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

BLACKMAR, Justice, concurring in part and dissenting in part.

### I.

The exclusion of jurors on account of views on capital punishment must be analyzed in terms of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The conclusion of the principal opinion can be justified under *Witt* because the excluded jurors indicated that they would place a burden of proof on the state greater than "beyond a reasonable doubt" in determining guilt or innocence. The application of a more severe burden during the guilt phase of the trial would be inconsistent with the applicable instructions.

If the venirepersons had said that they would place a higher burden on the state only at the punishment stage, it would have been patent error to exclude them on that basis. A juror has a duty to consider the death penalty, but no duty to vote for it, and may impose an extremely stringent burden on the state to justify imposition of death. To allow prosecutors to tread too close to the line is to court reversible error.

I am not easy with the holding that the exclusions in this case were proper. It appears that the prosecutor skillfully led the venire, in an attempt to cull those who were merely unsympathetic to the death penalty but not unequivocally opposed to it. *Witherspoon* and *Witt* seek to inhibit such culling. I doubt that the panel members really thought in terms of the meticulously legalistic questions tendered.

### II.

As to the punishment, I start with the distinct sense that the facts of this offense, gruesome as they may be, do not constitute the type of crime the legislature had in mind when it reauthorized the death penalty. The defendant and his companions went out on a drunken and violent spree. They ended up brutally beating a young man who had displeased them in some way. Their offense seems to me to be one of impulse and passion.

This Court continually refuses to face up to its responsibilities in proportionality review. The Supreme Court of the United States in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) struck down the death penalty, with a plethora of opinions, because none of the statutes then before it provided a sufficient basis for canalizing the assessment of the death sentence. That Court later upheld a Georgia death sentence statute in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), holding that the statute supplied the deficiencies observed in *Furman* because it was a carefully devised plan for assessing the death sentence. Our statute is modeled largely upon Georgia's.

From the very beginning, however, this Court has been uneasy with proportionality

review, as though it resented an increased burden of a review which, though mandated by statute, is unusual in criminal appeals. Even though the Court was provided with an officer for the purpose of comparing death sentences, *§ 565.035.6, RSMo 1986,* it has seldom made use of his services for this purpose. The Court very early substantially limited the scope of review by excluding (1) cases in which the prosecutor did not seek the death penalty even though it was authorized for the offense charged, and (2) cases in which the jury was asked to return a death sentence, but found guilt of a lesser degree than would authorize a death sentence.[1] The restrictions remove from the Court's consideration data necessary for any meaningful comparative analysis of the application of the death penalty.

Even in the cases in which the death penalty was submitted and assessed this Court has never enunciated any meaningful standards for comparison. The late Judge Billings expressed the Court's approach in a concurring opinion in *State v. Bibb,* 702 S.W.2d 462, 466 (Mo. banc 1985), as follows:

> We should not use our statutory grant of proportionality review as a vehicle to circumvent the declared public policy of this State approving the death penalty in certain instances.

This is a frank and realistic characterization of the Court's attitude, even though proportionality review is part and parcel of our state's policy. Death sentences are routinely affirmed, with review of the sentence only for prejudicial error, and without a genuine proportionality review.

The attempt at proportionality analysis in the principal opinion demonstrates the flaw in the Court's whole approach to its statutory obligation. The opinion tries to find some cases which have some of the characteristics of this offense. Apparently any one will do. This approach falls short of the Court's responsibility under *§ 356.035.3(3)* to consider "the crime, the strength of the evidence, and the defendant." The cases which are cited are all

cases in which the Court did not engage in the systematic review mandated by the governing statute, and so share the flaw of the principal opinion.

The Court is enjoined to consider the defendant's age at the time of the crime. *§ 565.032.3(7).* The principal opinion lists such cases as *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. Lashley,* 667 S.W.2d 712 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); and *State v. Walls,* 744 S.W.2d 791 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). *See also State v. Wilkins,* 736 S.W.2d 409 (Mo. banc 1987), *aff'd sub nom., Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). By observing that the defendants in those cases were young, the principal opinion seems to dismiss the defendant's age in any future proportionality review, and thus disregards the statute. All the cases cited involved willful and deliberate murders committed during robberies. The facts of those cases are very different from this case, and do not support the conclusion that this death penalty is proportionate.

In dealing with the circumstance that the defendant's companion in crime, who struck blows along with him, was allowed to plead guilty to murder in the first degree, in return for the state's agreement not to seek a death sentence, the principal opinion cites no comparable case. *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984), is not pertinent authority for the proportionality analysis in this case. *Laws* involved a premeditated series of robberies and murders of elderly victims. For this reason *Laws* is utterly incomparable to the present case, in which the killing was the impulsive reaction of two people. The principal opinion seems to hold, however, that the punishment of the defendants' associates in crime is never a

---

1. *State v. Bolder,* 635 S.W.2d 673, 685 (Mo. banc 1982).

material circumstance when weighing the appropriateness of the death penalty. This anomaly would surprise any detached observer.

The aggravating circumstances in this case are flimsy. The instruction allowed the jury to find the "depravity" circumstance solely on a finding of intent to mutilate the victim's body. The instruction violates the teachings of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), which suggest that instructions on depravity of mind must be closely confined to assure that the jury is not allowed a roving commission. The instruction given in this case is insufficient, under *Godfrey* and *Maynard*, to satisfy the *Gregg* rule that the death penalty may be imposed only under a carefully devised statutory scheme. As those opinions point out, any deliberate killing may be characterized as "outrageously or wantonly vile, horrible or inhuman" and to involve "depravity of mind." It seems strange that the mutilation of a corpse would make the difference between life and death. Yet this jury was instructed that it could.

I see more reason in the "serious assaultive conviction" aggravating circumstance. If we are to have the death penalty, it might be an appropriate sanction for those who show a persistent proclivity toward uncontrolled violence, which might continue in the prison system. In this case, however, two of the four convictions relate to the same spree that gave rise to the murder charges. The forcible sodomy and felonious restraint offenses do not strike me as the kind of assaultive convictions the general assembly had in mind when it codified as an aggravating circumstance a defendant's prior "conviction for murder in the first degree, or ... serious assaultive criminal convictions." *§ 565.032.2(1)*.

It is also of interest that all of the convictions were entered after the defendant was arrested and charged in the present case. I do not mean to suggest that assaultive convictions subsequent to the crime may not be considered at the punishment stage,

but the prosecutor seems to have made a concerted effort to get convictions on the record to aid in this prosecution. In our proportionality review we should examine the assaultive convictions considered by the jury, rather than simply approving the death penalty for a defendant with any record of assaultive convictions.

In *State v. Davis*, 814 S.W.2d 593 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992), I commented on the Court's neglect of its responsibility for proportionality review. I adhere to the views there expressed, as well as to my partial dissent in *State v. Powell*, 798 S.W.2d 709, 718 (Mo. banc 1990). That case involved two killings, which might be a special circumstance the Court properly could enunciate in establishing standards. But the Court in *Powell* proceeded in its customary ad hoc manner, although the behavior of the defendant appeared to be spontaneous and impulsive. The net result of the Court's neglect is a continuing series of affirmances, supported only by citations of cases which themselves lack meaningful proportionality review. I cannot vote to sustain the death sentence on the facts of this case.

The state points out that proportionality review is not required by the Supreme Court of the United States. That Court has shown a disposition in recent years to give the states greater freedom in the implementation of the death penalty. The Court does not seem to realize that this greater freedom simply enhances our responsibility. *See State v. Feltrop*, 803 S.W.2d 1, 23 (Mo. banc 1991) (Blackmar, J. dissenting).

I would vacate the death sentence. On this record, I would exercise our statutory responsibility by directing a sentence of life imprisonment without parole.