STATE of Missouri, Respondent,

v.

Walter BARTON, Appellant.

No. SC 87859.

Supreme Court of Missouri,
En Banc.

Dec. 18, 2007.

Rehearing Denied Jan. 15, 2008.

Elizabeth Unger Carlyle, Columbus, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Asst. Atty. Gen., Jefferson City, for Respondent.

STEPHEN N. LIMBAUGH, JR., Judge.

Appellant, Walter Barton, was convicted by a Cass County jury of murder in the first degree for the October 1991 murder of Gladys Kuehler. Because the death penalty was imposed, this Court has exclusive appellate jurisdiction. Mo. Const., art. V, sec. 3. Affirmed.

I.

In March 2006, after numerous changes of venue, two mistrials, a trial and conviction followed by a reversal and remand by this Court, *State v. Barton,* 936 S.W.2d 781 (Mo. banc 1996), a second trial and conviction followed by an affirmance by this Court, *State v. Barton,* 998 S.W.2d 19 (Mo. banc 1999), and a prolonged Rule 29.15 proceeding in which the motion court vacated the conviction and the state took no appeal, the case went to trial for the fifth time. The evidence at trial, which is viewed in the light most favorable to the verdict, *id.* at 21, is as follows:

The victim, who was 81 years old, was the manager of a mobile home park in Ozark, Missouri, and lived in a trailer she owned there. On the morning of October 9, 1991, Carol Horton, another resident of the park, went to the victim's trailer to assist her because she was infirm and unable to move about without the use of a cane. Horton left for a while to shop for the victim and to retrieve her mail and returned at about 11:00 a.m. When Horton saw the victim at that time, the victim was sitting on a daybed she kept in her living room, and she looked like she was "doing okay."

Around noon that day, appellant came to Horton's trailer. Appellant regularly frequented the park, but Horton had not seen him in a week, and appellant told her he had been living in his car. He was in a "happy-go-lucky" mood, talking and "dancing around" to radio music in Horton's trailer. He stayed at Horton's until around 2:00 p.m., when he said he was going to the victim's trailer to see if the

victim would lend him $20.00, and he returned about 10–15 minutes later, still in a good mood.

Between 2:00 and 3:00 p.m., several people had contact with the victim at her trailer. Teddy Bartlett and his wife, and Sharon Strahan, all former residents of the trailer park, visited the victim around 2:00 p.m. and stayed until sometime around 2:45. While they were there, Dorothy Pickering, who co-owned the trailer park with her husband, Bill, and who was at the park with her husband cleaning a trailer, stopped by the victim's trailer to pick up some rent payments. A man named Roy also stopped by to return a fan and a magazine to the victim. In addition, at about 2:30, Debbie Selvidge, the victim's granddaughter, called the victim and spoke with her briefly. The visitors all left when the victim said she was not feeling well and was going to take a nap.

Meanwhile, appellant told Horton that he was going back to the victim's trailer, and left sometime around 3:00. As Bartlett and Strahan left, Strahan noticed appellant standing at the driver's side door of a pickup truck parked near the victim's trailer talking to someone inside the truck. Shortly thereafter, around 3:15 p.m., Bill Pickering called the victim's trailer because his wife said the victim wanted to talk to him about someone moving into the park. A male voice answered the telephone, and Pickering asked to speak with the victim. The man hesitated, and then said, "She's in the bathroom." Pickering then told the man who he was and asked to have the victim call him back.

Around 4:00 p.m., about an hour after he left Horton's trailer, appellant returned and asked to use her restroom, which she permitted. After a while, Horton noticed that appellant had been in there for a long time, and she had never heard the toilet flush, so she went to check on him and saw

him at the sink. He said he had been working on a car and was washing his hands. All told, appellant spent about ten minutes or so in the bathroom. Horton also noticed, however, that appellant's mood had changed, and now, instead of being jovial as he was before, he was distant and seemed in a hurry. He asked her if she would take him to the "Fast Track" to get his car, but she said she could not, because she was going to the victim's trailer. At that point, appellant said, in a "very strong," definite voice, "No, don't ... Ms. Gladys is lying down taking a nap." Horton went anyway, knocking on the victim's door around 4:15 p.m., but there was no answer, and Horton then left the park to get her car washed.

In the meantime, Selvidge called the victim at 4:00 p.m., as the two watched the same television program together everyday while talking on the telephone. When there was no answer, Selvidge went to the trailer to check on her grandmother. She knocked for some time, but there was no answer, and she noticed that there were no lights on, which was unusual, because the victim always left the porch light on when leaving the trailer. Selvidge then left the park to seek help from her mother.

At about 4:30, Horton returned home and went back to the victim's trailer to check on her, but again received no answer to her knocking. Between 6:00 and 6:30, Selvidge arrived back at the park and went to Horton's trailer, asking about the victim and telling Horton she had been trying to call the victim since 4:00. The two of them then returned to Selvidge's mother's house to try to call the victim again, and when they still were unsuccessful, they went back to the park and asked appellant, who had been at a neighbor's trailer, to help knock on the door again. The three took turns knocking on the door and calling out the victim's name, and appellant went over

to the end of the trailer where the victim's bedroom was located and knocked on the side of the trailer. There still was no response so they decided to contact the police.

Horton and Selvidge then drove to the nearby town square, flagged down an Ozark police officer, and led him back to the park. After unsuccessfully attempting to enter the victim's trailer, the officer called for a locksmith, and then left to take care of another call. A short time later, the locksmith arrived and opened the front door, and Selvidge, Horton, and appellant entered the trailer.

Once inside, they called the victim's name, but received no answer. Selvidge started to walk down the hallway leading to the victim's bedroom when appellant said, "Ms. Debbie, don't go down the hall. Ms. Debbie, don't go down the hall." Selvidge noticed that the victim's clothes were in the bathroom by the stool and that the toilet lid was up, which was unusual. She then turned on the lights in the victim's bedroom and screamed as she found the victim, "practically nude," lying on the floor between her bed and closet. The victim had been stabbed numerous times, with her throat cut ear-to-ear and with her intestines eviscerating from some of her wounds. Selvidge started to bend down to touch the victim, but Horton, who had followed Selvidge down the hall to the bedroom, told her not to do so. Selvidge then went back into the hall, pushed past Horton and appellant, who was following Horton, and went back to the living room. Appellant said to Horton, "Let me see," and looked over Horton's shoulder into the bedroom at the victim, but he never got close to the body or the blood in the bedroom. Appellant did not get upset upon seeing the victim, but remained calm, showing no emotion, and when he went back into the living room, he "comforted" Selvidge, telling her that he was "so sorry."

The police officer soon returned to the trailer, and after seeing that the victim had been stabbed, he cleared the scene and called for help. After paramedics arrived, the officer interrogated those persons present. He asked appellant if he had seen the victim that day, and appellant told him that he had seen her between 2:00 and 2:30 that afternoon when he had asked her to lend him $20.00. He said that the victim told him she would lend him the money, but would have to write a check, which she would do later in the day. Appellant claimed that this was the last time he had been there. However, appellant later spoke with a Highway Patrol investigator and told him that he was the one who answered the telephone call that Bill Pickering made at 3:15 that afternoon. Because that call occurred between when the victim was last seen alive and when she was found dead, the officers took appellant into custody.

At that point, the officer noticed what appeared to be blood on the elbow and shoulder of appellant's shirt, and appellant responded that he had gotten the blood on him when he slipped while pulling Selvidge away from the victim's body. Selvidge, however, reported that she had not gone in the room past the victim's feet, that she had no blood on her clothes, that nobody had fallen in the room, and that appellant and Horton had remained behind her while she was in the room. Police also noticed that neither Selvidge nor Horton had blood on them, that the victim's blood on the floor was "pretty well dried," as if it had been there for a while, and that there was no wet blood to slip on where the witnesses were standing in the room.

The investigation of the scene also revealed that there was blood on the sink of the victim's bathroom and on a table in the

bathroom. The victim's checkbook was found. Although the victim regularly entered every check she wrote in her check register, there was no entry for check # 6027—that check was missing. Several knives also were seized from the scene, including one that was part of a set that was cleaner than the others and facing a different direction in the block, and another knife that was later found in a drainage ditch. Although none of these knives were positively identified as the murder weapon, the examiners did not exclude any of those knives as the murder weapon.

Three days after the murder, a young girl was cleaning up trash along a nearby highway with a group from her church when she found the missing check, # 6027, folded up and discarded in a ditch. The check was dated the same day of the murder and made payable to appellant for $50.00. Handwriting analysis confirmed that the victim had written everything on the check.

Tests conducted on appellant's clothing revealed that there was human blood on his shirt, blue jeans, and boots, and DNA tests conducted on the blood from appellant's shirt showed that it was the victim's blood. A blood spatter expert testified that some of the blood found on appellant's shirt, as well as two spots on appellant's jeans, were consistent with stains created by a "medium-to-high-energy impact," meaning the blood was ejected from the source by a blow or "transfer of energy" and not by simply rubbing up against already-present blood.

An autopsy conducted on the victim revealed that she was stabbed well in excess of 50 times, including being stabbed twice through her open right eye and once in the left eyelid, twice in the neck, eleven times in the left side of her chest, three times in the right chest, four times in the abdomen, twice to the back of the left hand (charac-

terized as defensive wounds), twice to the back of the left arm, twenty-three times in the back, and three times in the left flank. There were at least two large slash wounds across her neck, one of which contacted the bone. There were also two X-shaped slash wounds to the abdomen, through one of which the victim's small intestine protruded. Internally, the victim's left lung collapsed, and one of her ribs fractured from the force of the attack. The cause of death was exsanguination due primarily to the wounds to her neck as well as the numerous other stab wounds. There was also at least one blunt force injury to the victim's head, and some bruising and injury to the victim's genital area that led examiners to the conclusion that the victim was sexually assaulted.

At some point after the murder, appellant was incarcerated in the Lawrence County jail, where inmate Katherine Allen was serving as a trusty, serving meals and doing laundry. From time to time, she and appellant argued, and on more than one occasion, appellant threatened her, asking her if she knew what he was in jail for and saying that he would kill her "like he killed that old lady."

Appellant did not testify, but called four witnesses: A resident of the trailer park who testified that she had dinner with appellant on the night of the murder and did not see blood on him; two Highway Patrol criminalists—one of whom testified that a hair found on the victim and one found in the bedroom did not exhibit the same characteristics as appellant's hair—and the other who could not positively identify one of the seized knives as the murder weapon; and a Highway Patrolman who testified to "inconsistencies" in Katherine Allen's testimony regarding her statements to him.

During the penalty phase, the state presented evidence that appellant had been

convicted of two prior felony offenses: 1) assault with intent to kill with malice aforethought for robbing a gas station at gunpoint and then assaulting the female clerk by hitting her over the head with a full paint can; and 2) assault in the first degree for assaulting another female grocery store clerk during another attempted robbery. The state also recalled Debra Selvidge who presented victim impact testimony. Appellant called two friends, whom he originally met through a prison ministry, and his wife, whom he met through an inmate "pen friend organization," all of whom testified about the effect executing appellant would have on their lives.

At the conclusion of the penalty phase, the jury made affirmative findings on all three statutory aggravating circumstances submitted—that the murder was outrageously wanton and vile and that appellant had two prior assaultive criminal convictions—and recommended a sentence of death. In accordance with the jury's verdict, the court sentenced appellant to death for first-degree murder. This appeal follows.

## II.

Appellant presents fifteen points relied on, which will be addressed in turn.

### 1.

■ The first claim is that "the evidence was insufficient to show [appellant] committed the offense in the absence of eyewitnesses, credible physical evidence, or credible evidence of inculpatory statements by Mr. Barton. . . ." The gist of this argument, appellant explains, is that "[m]ere presence at the scene of an offense is insufficient to sustain a conviction . . . [and][e]ssentially, that is all the state can produce here." To the contrary, there was ample evidence of guilt, which, as noted, is

to be viewed in the light most favorable to the verdict. *State v. Barton,* 998 S.W.2d at 21. A recap of the evidence is this: The victim's blood was found on appellant's clothing the night of the murder, and a blood spatter expert testified that some of the blood stains were created by the "forceful ejection" of the victim's blood in appellant's presence. In addition, appellant made inconsistent statements to the police, telling them that the last time he saw the victim was at her trailer between 2:00 and 2:30 on the day of the murder, though he later admitted that he received the telephone call from Bill Pickering in the victim's trailer, which was made at 3:15, well after appellant originally said he had left. His mood change before and after the murder, the undue time he spent at the sink in Horton's bathroom, his statement to Horton not to go to the victim's trailer, and his insistence that Selvidge not go down the hallway, are all further indications of guilt. Also, the discovery of the disposed-of check, which had been made out to appellant, but had not been entered in the check register, is an indication that appellant tried to rid himself of evidence tying him to the murder. Finally, there was evidence that appellant admitted the crime when Katherine Allen testified that appellant threatened to kill her "like he killed that old lady." But even without that admission, the evidence of guilt was more than sufficient to support the verdict.

### 2.

Appellant's second point, and the point to which he devotes the most attention, is that the Double Jeopardy Clause should have precluded the retrial of this case because of prosecutorial misconduct in the previous trial. This claim centers around the testimony of Katherine Allen, whom appellant describes as a "jailhouse snitch." As noted, although this Court affirmed the

conviction and sentence after the second trial, the post-conviction motion court granted a new trial under Rule 29.15. The grounds for relief, all based on a denial of due process, were 1) that the prosecutor failed to disclose Katherine Allen's full criminal history and aliases; 2) that the prosecutor "failed to correct perjured testimony" by Allen that she had only been convicted of six counts of passing bad checks and one count of escape from custody when in fact she also had been convicted of ten counts of forgery, ten counts of theft, one count of conversion, and one count of credit card fraud; and 3) that the prosecutor failed to disclose that another forgery charge in a different county had been dismissed at the prosecutor's request. The motion court also determined that these failures were "critical" in that they prevented defense counsel from adequately cross-examining Allen, and, as a result, there was a "reasonable probability" of a different result at trial. After remand to the trial court, appellant filed a motion to dismiss on double jeopardy grounds relying on the motion court's findings of fact and conclusions of law. The motion was overruled.[1]

■ Until 1982, courts had uniformly held that the Double Jeopardy Clause did not prevent a retrial where a defendant sought and obtained a mistrial or reversal of his conviction on appeal. In *Oregon v. Kennedy*, 456 U.S. 667, 675–76, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), however, a plurality of the Supreme Court held that the Double Jeopardy Clause precludes a retrial when the prosecutor deliberately engages in misconduct for the purpose of

goading the defendant into moving for a mistrial and with the intent of "subvert[ing] the protections afforded" by the clause. Appellant now asks this Court to extend *Oregon v. Kennedy* to preclude a retrial even in the absence of a mistrial, arguing that it should make no difference that prosecutorial misconduct that would have resulted in a mistrial was not discovered until after trial. In fact, several federal circuit courts have taken this approach. *See, e.g., United States v. Catton*, 130 F.3d 805, 806–08 (7th Cir.1997); *United States v. Gary*, 74 F.3d 304, 314–15 (1st Cir.1996); *United States v. Wallach*, 979 F.2d 912, 916 (2nd Cir.1992). As Judge Posner put it in *United States v. Catton:*

> Confined to cases in which the defendant is goaded into moving for a mistrial, whether the motion is granted or denied, *Kennedy* would leave a prosecutor with an unimpaired incentive to commit an error that would not be discovered until after the trial and hence could not provide the basis for a motion for a mistrial, yet would as effectively stave off an acquittal and thus preserve the possibility of a retrial. Suborning perjury would be a good example. It can be argued that if the prosecutor commits a covert error for the same purpose that he might have committed an open error calculated to evoke a motion for a mistrial (before *Kennedy* made this tactic unprofitable—namely, to prevent an acquittal and so preserve the possibility of retrying the defendant even if the error is sure to be discovered and result in a reversal of the conviction either on direct appeal or on collateral attack—the

---

1. Before filing briefs, appellant filed a motion to supplement the record with the transcript of the post conviction relief hearings and the state objected on the ground that the transcript was never offered in support of the motion to dismiss before the trial court. This Court then took the motion to supplement

with the case. From a close review of appellant's briefs, it appears that he never cited the PCR transcript but only the findings of fact and conclusions of law entered by the motion court. Therefore, the motion is overruled as moot.

double jeopardy clause should protect the defendant against being retried. 130 F.3d at 807.

However, Judge Posner, drawing on *United States v. Wallach,* then cautioned that the prosecutor must have the intent of subverting double jeopardy protection:

> For it is clear that a defendant who wants the district court (or this court on appeal from an adverse ruling by the district court) to block a retrial on the basis of prosecutorial error must show that the prosecutor committed the error *because* he thought that otherwise the jury would acquit and he would therefore be barred from retrying the defendant. *It is not enough that there was an error; it is not enough that it was committed or procured by the prosecutor; it is not enough that it was deliberate prosecutorial misconduct; it must in addition have been committed for the purpose of preventing an acquittal that, even if there was enough evidence to convict, was likely if the prosecutor refrained from misconduct.* Any greater extension of *Kennedy* must be left to the Supreme Court, in view of the danger of adding a double jeopardy tail to every appellate-reversal dog.

*Id.* at 807–08. (second emphasis added) (internal citations omitted). As the *Wallach* court further explained, the misconduct of the prosecutor must be undertaken "not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct." *Wallach,* 979 F.2d at 916.

■ Even should the Supreme Court adopt this extension to *Oregon v. Kennedy,* the appellant in this case has not met the required showing that the prosecutor intended to subvert double jeopardy protection. Although the motion court determined that the prosecutor's misconduct re-

quired a new trial because there was a reasonable probability that the outcome would have been different, it does not necessarily follow that the prosecutor engaged in the misconduct for the purpose of avoiding an acquittal or that he believed at the time of the misconduct that an acquittal was forthcoming. The motion court made no findings on that point, and the appellant presents no evidence in support of it other than an inference from the misconduct itself. But the fact of the prosecutor's misconduct alone does not prove his intent to prevent an acquittal, much less that he believed that an acquittal was likely to occur, and his misconduct may just as well be attributed to poor judgment. After all, even without Allen's testimony, there was ample evidence of guilt so that the prosecutor would likely be confident of a conviction. This is especially true considering the positive DNA match of the victim's blood on appellant's clothing, which was evidence that was not available at the first trial. The record simply does not support the conclusion that the prosecutor intended to prevent an acquittal, and for that reason, the Double Jeopardy Clause does not prevent retrial of the case.

### 3.

■ For his third point, appellant asserts that the trial court erred in denying appellant's motion for mistrial when a law enforcement officer testified that appellant had refused to answer questions after being given his Miranda warnings. This testimony, appellant claims, violated his constitutional right against self incrimination. The dispute arose when the officer was asked, "Did you ask Mr. Barton anything concerning the stain on his shirt?," and the officer responded, "Well, yes. At that point, he said he wasn't answering questions." Defense counsel objected, the ob-

jection was sustained, and the court admonished the jury, stating, "[Y]ou are to disregard the last comment from the witness, the comment being, 'Well yes. At that point, he said he wasn't answering questions.' You are instructed to disregard that...." Defense counsel then moved for a mistrial, which the court took under advisement. Resuming the examination, the prosecutor asked if appellant "ever" told the officer how he got the blood on his clothes (which was an unstated reference to pre-arrest, pre-Mirandized questioning), and the officer replied that appellant told him that he got the blood on this clothes when he was helping pull either Selvidge or Horton away from the victim's body. The court eventually overruled the motion for mistrial. The standard of review is abuse of discretion. *State v. Goff,* 129 S.W.3d 857, 866 (Mo. banc 2004).

*Doyle v. Ohio,* 426 U.S. 610, 618–19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), held that reference to a defendant's silence, request for an attorney, or refusal to answer questions, after the defendant has been arrested and given his Miranda warnings, is error. Miranda warnings, *Doyle* held, carry an implicit "assurance that silence will carry no penalty." *Id.* at 618, 96 S.Ct. 2240. Arguably, the testimony in this case that appellant "said he wasn't answering questions" does not trigger *Doyle.* The state maintains that although appellant had been Mirandized at the time of questioning, there is no evidence that he was under arrest, and as this Court noted in *State v. Mahan,* 971 S.W.2d 307, 315 (Mo. banc 1998), *"Doyle* is expressly limited to the use of silence '*at the time of arrest and after receiving Miranda warnings.*'" *Id.* at 315 (quoting *Doyle,* 426 U.S. at 619, 96 S.Ct. 2240) (emphasis added). Appellant relies on the interrogating officer's testimony that at the time of questioning, appellant had been "secured" and taken to the courthouse. Thus, it is clear that appellant was, at least, in custody at the time of questioning.

■ Assuming that the testimony was an impermissible reference to appellant's silence, there still was no abuse of discretion in overruling the motion for mistrial because the trial court granted adequate relief by sustaining the objection and admonishing the jury to disregard the testimony. This was sufficient to prevent the jury from fixating on this isolated statement, as the jury is presumed to follow the court's instructions. *State v. Forrest,* 183 S.W.3d 218, 229 (Mo. banc 2006). However, appellant argues that this remedy was insufficient, primarily because the court emphasized the testimony by stating it to the jury verbatim, thus aggravating the problem, and because the evidence of guilt was not so overwhelming to overcome the prejudice caused. To the contrary, any prejudice was minimal. The prosecutor did not attempt to elicit the statement, which appears to have been volunteered by the witness, and the prosecutor did not later attempt to argue any inference from it. In fact, the prosecutor backtracked and elicited the information that he was actually seeking—appellant's pre-arrest, pre-Mirandized statement that he got the blood on his shirt pulling Selvidge or Horton away from the victim's body. In this way, any inference that appellant was hiding anything or failing to cooperate by not answering questions was greatly diminished. For these reasons, appellant cannot show a real probability of prejudice from the failure to declare a mistrial.

4.

■ Appellant claims in point four that "[t]he trial court erred in preventing [defense] counsel from questioning jurors during voir dire concerning whether they

would be able to consider mitigating circumstances after finding that the evidence in aggravation warranted the death penalty." The issue arose when the trial court disallowed the following question addressed to juror number 33:

The State has found you as a juror. You have found someone guilty of murder in the first degree. You have found aggravating circumstance. You have found, as a juror, that all the evidence warrants the death penalty. Could you go to the next stage and give meaningful consideration to a life verdict, a life imprisonment without parole verdict?

The court responded:

It is not an accurate statement of the law for you to get them to make that sort of commitment. You can't get them to say you already decided that the evidence warrants the death penalty and then say would you vote for the death penalty. Of course, they would. . . .

The context of this exchange, and the apparent purpose of defense counsel's question, was to determine whether any jurors would automatically vote for the death penalty. The prosecutor had previously explained that if the jury unanimously determined that the aggravating circumstances warranted death, the jury would then have to consider the mitigating circumstances before imposing a death sentence. The implicit point of the court's objection, then, was that defense counsel's question to the juror omitted a step required in the jury instructions—the consideration of mitigating circumstances—which, ironically is the very concern of which appellant now complains. The trial court was correct that the question posed would not accurately discover those venire members who would automatically impose the death penalty because that determination cannot be made without learning whether those jurors would automatically impose the death penalty regardless of mitigating circumstances. Furthermore, at no time did the trial court prevent defense counsel from asking the jurors whether they would consider mitigating circumstances. There was no error.

### 5.

■ Appellant next requests plain error review of the trial court's admission of blood spatter evidence on the grounds that the expert witness called by the state "was not shown to possess expertise sufficient to offer the opinions to which he testified nor to have used proper scientific methods to form his opinions." It is no wonder that appellant did not object to the admission of this evidence or to the expert's qualifications or methods, because the expert was well-qualified. Those expert's qualifications and methods, as documented in the record and summarized in the state's brief are as follows:

[The expert] testified that he was currently with the Madison crime lab of the Wisconsin Department of Justice after serving fourteen years with the Kansas City Police Department crime lab. He received a bachelor's degree in physics from Purdue University, an engineering university, in 1970, and then took a couple of years worth of graduate-level courses in physics until he joined the California Department of Justice crime lab in August 1972. In his second year at the California lab, he was assigned to the serology section, concerned with the identification of blood, often from stains on clothing. While in that section, he also received training in crime scene processing and reconstruction, which included training in bloodstain recognition—being able to identify stains necessary for analysis as well as recognizing how those stains were created. While with that lab, he had experience with

bloodstain creation and experimentation, but did not receive formal training until moving to the Kansas City lab. In 1994, he studied with two of the preeminent bloodstain pattern interpreters in that field in creating and evaluating blood spatters at a week-long training course. While [he] had not had any articles published in a forensic journal on bloodstain pattern evidence, he had trained other criminalists in blood spatter evidence for 5–6 years. He also mentioned books that he had studied regarding blood spatter evidence as part of his education in the field. He testified that he had been qualified as an expert witness in the field of blood spatter evidence in other court cases. He testified that he had been working with blood spatter evidence since he first encountered it in 1974 in the California crime lab.

As to the field of blood spatter evidence, [he] testified that blood spatter was a type of staining pattern which creates smaller bloodstains due to the application of energy to the source of the blood. He testified that blood spatter recognition is a generally accepted scientific principle, with other blood spatter experts throughout the nation, which relied on experimentation and observation to reach its conclusions. He testified that the processes for creating blood stain patterns, with peer review for the purpose of recreating the conclusions reached from that process, was done throughout the country and was "very common." He described the steps of the scientific method used in the field, which included observing existing bloodstains, using that observation coupled with an understanding of the principles such as the mechanics of fluids and how they react to pressure and force to create a theory as to how those stains were created, testing that theory with experiments attempting to recreate the stain

patterns, interpreting the results of the experiments to draw a conclusion as to whether a certain type of pattern is consistent with a type of blood spatter or eliminated as such.

(internal citations omitted). In view of this record, there was no error, plain or otherwise. The claim is frivolous.

### 6.

■ Appellant next claims that the trial court plainly erred "in admitting the former testimony of Sharon Strahan in which she identified Mr. Barton and referred to a lineup as to which an objection had been sustained." By the time of trial, witness Strahan had died, so a part of the transcript of her former testimony was read into evidence. Defense counsel objected, however, to that portion of her testimony regarding a photograph lineup in which she identified appellant on the ground that the lineup had not been disclosed. Because the state could not locate anything proving disclosure of the lineup, the court ruled that the portion of her prior testimony regarding the lineup would not be read and directed the state to redact that portion of the transcript. However, the testimony, as then read to the jury, included a question on cross-examination stating, "So when you made your identification, did you make it based on his clothing?" to which the witness answered, "Yes, ma'am." Because appellant did not object to this testimony, appellant again asks for plain error review, which, under Rule 30.20, requires a finding that manifest injustice or miscarriage of justice resulted from a trial court error.

Appellant claims that the redaction of the transcript failed to achieve its purpose of excluding evidence of the pretrial lineup because the question was worded "when you made your identification." This reference, appellant contends, "clearly informed

this jury that Ms. Strahan had previously identified Mr. Barton." However, the question makes no reference to a prior photographic lineup, but merely her identification of appellant based on observing him. In any event, appellant could not have suffered prejudice, much less manifest injustice, because the witness's identification was cumulative to other evidence placing appellant at the scene of the crime, especially the evidence that appellant had answered the victim's telephone at 3:15 p.m. For the same reason, appellant's related claim—that Ms. Strahan's in-court identification testimony should have been suppressed because the prior lineup had not been disclosed—also fails.

### 7.

■■■■■ Appellant next argues that the trial court plainly erred in preventing defense counsel from cross-examining Katherine Allen concerning the nature of the crimes of which she had been convicted so as "to elicit testimony that these crimes involved untruthfulness, which was relevant to Ms. 'Allen's' credibility." After defense counsel established on cross-examination that Ms. Allen had been convicted thirteen times for forgery, fraud, bad checks, and the like, counsel then asked, "So you lie about who you are in order to get something of value?" The trial court sustained the prosecutor's objection to the question, reasoning that it is impermissible to inquire about the details of the witness's prior convictions. Ordinarily, the scope of cross-examination is a matter of trial court discretion, *State v. Isa*, 850 S.W.2d 876, 896 (Mo. banc 1993), but because this claim was not included in the motion for new trial, appellant again asks for plain error review under the manifest injustice standard of Rule 30.20.

Appellant's exact claim is that "[t]he limitation on cross-examination effectively prevented trial counsel from emphasizing to the jury that Ms. 'Allen' had committed numerous criminal acts involving dishonesty." This Court disagrees. Dishonesty is at the very heart of the crimes in question, and once the witness admitted to the commission of those crimes, any further admission that she was dishonest in committing the crimes would have essentially been cumulative. Moreover, in closing argument, defense counsel drove home the point that Ms. Allen's criminal acts were acts of dishonesty, stating:

> [Ms. Allen] is a woman who her entire life apparently has portrayed herself as other people, has lied to banks, has lied to merchants, has lied to almost everybody about who she is, what the availability of her funds are, what sort of ability she has to make payments, and she gets herself in trouble after trouble after trouble. This is a scheming, conniving sort of person, and the State knows it.

Under these circumstances, there was no abuse of discretion in limiting cross-examination, nor manifest injustice.

### 8.

Appellant's eighth claim is that the trial court plainly erred in submitting Instructions 14 and 15, patterned after MAI–CR 3d 313.42B and 313.44B, respectively. These instructions direct the jury on its consideration of aggravating and mitigating circumstances in penalty phase. Appellant's argument that the pattern instructions "improperly prevent[ ] the jury from giving full consideration to mitigating evidence" has been repeatedly rejected by this Court. *See, e.g., State v. Clayton*, 995 S.W.2d 468, 478 (Mo. banc 1999); *State v. Kinder*, 942 S.W.2d 313, 333 (Mo. banc 1996); *State v. Wise*, 879 S.W.2d 494, 518 (Mo. banc 1994). Although appellant contends that the recent cases of *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150

L.Ed.2d 9 (2001), and *Abdul–Kabir v. Quarterman,* —— U.S. ——, 127 S.Ct. 1654, 1664, 167 L.Ed.2d 585 (2007), require this Court to reevaluate the propriety of the instructions, appellant concedes that both cases are addressed to the unique procedures of the Texas penalty phase instruction scheme. To the extent these cases apply to Missouri, they do nothing more than reemphasize the requirement that the penalty phase instructions must provide for meaningful consideration of mitigating evidence. The present instructions do so, and the point merits no further attention.

### 9.

In point nine, appellant asks for plain error relief because the trial court failed to "sua sponte instruct[ ] the jury to disregard the prosecution's statement that a transcript of an interview with [appellant] concerning a previous crime had been redacted prior to being read to the jury." Appellant maintains that "[t]his statement improperly allowed and encouraged the jury to speculate on what was missing." This argument, however, grossly mischaracterizes the record. In the penalty phase, the prosecutor had a law enforcement witness read a non-redacted portion of appellant's confession to a prior offense of assault with intent to kill, and the exact exchange was this:

> Q. [Witness], I am going to hand you Exhibit 71 again, and we have talked about [it] before we came in here about the possibility of you reading here.
> A. Yes.
> Q. And there are certain portions that we are not going to read because they are not relevant to what we are here about today.
> A. Yes.
> Q. And do you recall that?
> A. I do.

> Q. At this point, I am going to ask you to read the portions that are not bracketed[.]

There was no objection to this exchange because it was not at all improper. Nonetheless, appellant now claims: "This emphasis on the redaction of Mr. Barton's statement was almost worse than reading the statement itself. It begged the jury to speculate on what other horror the bracketed portion might contain." The record reflects otherwise. The prosecutor did not suggest that the portions of the statement contained information that was harmful to appellant, or information that was improper, but only that the information was not relevant. The statement was innocuous. The point is frivolous.

### 10.

Point ten, which is supported by only a cursory argument, is that "[t]he trial court plainly erred in failing to grant a mistrial when the state suggested, in final argument at the penalty phase, that Mr. Barton should be sentenced to death as punishment for his past crimes." Among the state's penalty phase witnesses were three ladies. The first testified about appellant's 1976 conviction for assaulting another woman, the second testified as the actual victim of an assault by appellant in 1984, and the third, Debbie Selvidge, testified about the impact of the victim's death on her family. During closing argument, the prosecutor said, "[W]hen someone commits a crime, no matter what happens to that individual, that's not the only one that's punished. Actually, the people that are punished are these three ladies back here who have walked up here and testified and told you their feelings . . . ." At that point, defense counsel objected, the prosecutor offered to withdraw the statement, and the court sustained the objection and instructed the

jury to disregard the statement. Defense counsel did not request a mistrial; therefore, review is under the plain error/manifest injustice standard of Rule 30.20.

Initially, this Court questions whether the prosecutor's comment crossed the line because it is a stretch to say that the prosecutor's brief comment suggested that the jury should sentence appellant to death for his past crimes. Regardless, any impropriety was corrected when the court sustained the objection and admonished the jury. The comment was brief, vague, and isolated and gives no reason to criticize the trial judge for failure to declare a mistrial *sua sponte*. There was no manifest injustice.

## 11.

Appellant next claims that "[t]he trial court erred in sentencing Mr. Barton to death based on his rejection of a plea bargain agreement...." In pronouncing sentence, the trial court first stated that this was the third time a jury had recommended a death sentence for this crime and that it had struggled with the decision "for many reasons." The court then commented:

> [Y]ou know, Mr. Barton, that you on the record were given an opportunity to take care of that yourself before the trial started, and that the State, in fact, did say to you: You know what? We will waive death if you will take a plea of guilty to a sentence of life without parole, and you made the decision to reject the State's offer and take your chances with the jury and go to trial.... [I]t is a difficult day. One that no judge I know ever wants to have to face, and I am sure you don't either.

> But to the extent that you made the decision before we picked a jury, it was an opportunity at least that you had to make this go away, and you chose to take your chance with a jury, and the job I have then, as far as I'm concerned, is to see to it that the trial is conducted fairly. I made my rulings pretrial. I have no concerns about, as far as I am concerned, the conduct of this trial, the way that it went, the way the evidence went, the way the jury selection process went, and the way the jury was permitted to consider the evidence, and then to consider what they believed to be appropriate.

> So the Court, after considering the alternatives, sentences the Defendant to death by lethal injection.

In these statements, appellant contends, "the trial court explicitly based its acceptance of the jury's sentencing recommendation on the fact that Mr. Barton had refused a plea bargain offer." Defense counsel did not object, so once again, review is for plain error/manifest injustice under Rule 30.20.

■ To be sure, appellant is correct that a court may not increase a defendant's sentence because the defendant exercised his right to a jury trial. As the Eighth Circuit put it, "whether a defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed." *Hess v. United States*, 496 F.2d 936, 938 (8th Cir.1974). *See also*, *United States v. Sales*, 725 F.2d 458, 460 (8th Cir.1984); *Thurston v. State*, 791 S.W.2d 893, 897 (Mo.App.1990). But the case here is different, and once again, appellant mischaracterizes the record. Unlike the cases cited, the court's comments, in context, did not show that the court was punishing appellant for going to trial. Instead the court was merely responding to the defense request to disregard the jury's recommendation by pointing out that it was appellant's wish to have the jury decide his fate and that the jury had reached

an appropriate decision on the sentence after a fair trial. In other words, the court was simply deferring to the jury's decision, consistent with the defendant's desire to have the jury try his case. Although appellant also complains that by deferring to the jury's decision, the trial court was abdicating its responsibility "to exercise independent review of the proper sentence," the court made clear that it imposed sentence only "after considering the alternatives." There was no manifest injustice.

### 12.

Appellant's twelfth point is that "this Court's scheme of proportionality review does not comply with the requirement of [section] 565.035.3(3) that this Court determine whether the death sentence in each case is 'excessive or disproportionate to the penalty imposed in similar cases....'" The specific argument is that the pool of cases for comparison is improperly selected, the method by which the cases are selected from that pool does not permit a "meaningful ability" to show why the penalty is disproportionate, and that this Court "fails to use adequate methods" in comparing the cases. This Court has repeatedly rejected these same claims. *See e.g., Lyons v. State,* 39 S.W.3d 32, 44–45 (Mo. banc 2001); *State v. Barnett,* 980 S.W.2d 297, 309 (Mo. banc 1998). The point is denied.

### 13.

 Appellant next claims that even under the method of proportionality review that he complains of in the preceding point, "[t]he death sentence here must be vacated because it is excessive and disproportionate to those imposed in other similar cases ... in that the evidence of guilt is not sufficient to support a death sentence, and Mr. Barton has been prejudiced by

prosecutorial misconduct." Under the mandatory independent review procedure set out in section 565.035.3, RSMo 2000, this Court must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

This independent proportionality review "is designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote the evenhanded, rational and consistent imposition of death sentences." *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo. banc 1993). In other words, it is designed to prevent "freakish and wanton application of the death penalty." *Id.*

Appellant does not contest the first two prongs of proportionality review. There is no indication that the sentence was imposed under the influence of passion, prejudice, or any other impropriety, and in fact, the record reflects that the state's presentation of evidence and argument during the guilt phase were straightforward and dispassionate. Likewise, the record shows that the evidence supporting the jury's finding of aggravating circumstances was more than sufficient. As noted, the state established that appellant had previously been convicted of assault with intent to kill with malice aforethought and convicted of a second, unrelated charge of assault in the first degree. In addition, the state proved that the murder was "out-

rageously wanton and vile" because the victim was "mutilated or grossly disfigured . . . by acts beyond that necessary to cause her death."

The first basis of appellant's challenge to the third prong is that the evidence supporting the conviction was weak, in that the case was based largely on circumstantial evidence and the only direct evidence—Katherine Allen's testimony about appellant's admission—was not credible. The dissent follows up on this argument, contending that *State v. Chaney*, 967 S.W.2d 47 (Mo. banc 1998), compels this Court to reduce the sentence from death to life in prison because the strength of the evidence, even if sufficient to support a conviction, is not sufficient to support the death penalty. To the contrary, the circumstantial evidence was strong, placing appellant alone with the victim during the small window of time during which the murder was committed (3:00 to 4:00 p.m.) and establishing that the victim's blood was spattered on appellant's clothing. And despite appellant's protestations about Allen's testimony, the jury, fully aware of Allen's prior record, deemed her credible nonetheless. Furthermore, *State v. Chaney* is distinguishable. In that case, "there [was] no eyewitness, confession, admission, document, fingerprint or blood evidence directly pointing to the defendant." *Id.* at 60. Here, in contrast, and again as noted, defendant admitted that he was present in the victim's apartment at 3:15 p.m. and there was blood spattered on the defendant's shirt that was undeniably the blood of the victim. It bears mention, as well, that the *Chaney* court's decision to overturn the death penalty was not due solely the perceived weakness in the strength of the state's evidence, but also to the fact that "Chaney had no prior criminal convictions and was a good husband, friend and step-father, and that he had a good reputation among those he worked for in his optical business." *Id.* Given appellant's prior convictions for assault with intent to kill and first degree assault, Chaney's situation was altogether different indeed.

■ Appellant's second basis for the challenge is a consideration of the defendant, himself, as mandated by the statute. For the reasons stated, however, appellant must take a different course than that in *Chaney*. Although appellant acknowledges that the penalty phase evidence in mitigation was "sparse," he maintains that additional and significant evidence about defendant's troubled background and difficult upbringing that was introduced during penalty phase at the earlier trials should be considered here. Despite the fact that this evidence was not introduced in the trial at hand, appellant argues that it should still be considered because the proportionality review statute does not expressly preclude it. However, it is implicit in the statute that the proportionality review be undertaken on the evidence in the record. And even if the earlier evidence were considered, it would not change the result. After all, the evidence apparently made no difference in the two earlier trials because appellant was twice sentenced to death.

■ Notwithstanding appellant's challenges, the key to proportionality review is a comparison to other cases for which the death sentence was imposed, and the comparison here shows that appellant's death sentence was not "freakish or wanton." This Court has repeatedly upheld death sentences where the depravity of mind was shown by the mutilation of the victims beyond that necessary to cause death. *See, e.g., State v. Strong,* 142 S.W.3d 702 (Mo. banc 2004); *State v. Reuscher,* 827 S.W.2d 710 (Mo. banc 1992); *State v. Feltrop,* 803 S.W.2d 1 (Mo. banc 1991). In

addition, this Court has repeatedly upheld the death penalty where the defendant had an assaultive criminal history. *See, e.g., State v. Brooks*, 960 S.W.2d 479, 496 (Mo. banc 1997); *State v. Chambers*, 891 S.W.2d 93, 108 (Mo. banc 1994); *Reuscher*, 827 S.W.2d at 716–17. And further, this Court has upheld the death penalty for murders of victims who were elderly, disabled, or helpless. *See, e.g., State v. Gilbert*, 103 S.W.3d 743, 752 (Mo. banc 2003); *State v. Barnett*, 980 S.W.2d 297, 310 (Mo. banc 1998); *Ramsey*, 864 S.W.2d at 327. In fact, this Court has previously held that the imposition of the death penalty on appellant for this same murder was not disproportionate, *State v. Barton*, 998 S.W.2d 19, 29–30 (Mo. banc 1999), and the evidence in this trial supports the same conclusion.

### 14.

 In this point, appellant contends that the trial court erred in failing to dismiss the case because of the mistrial that was granted in 1993 when the case was brought to trial for the first time. Appellant now claims that the Double Jeopardy Clause should have prevented all the subsequent retrials because the mistrial was caused by the state's failure to endorse witnesses on the indictment. This, he suggests, constitutes deliberate misconduct for the purpose of goading the defendant into moving for a mistrial, which, under *Oregon v. Kennedy* (and similar to appellant's second point), triggers double jeopardy protection.

Without regard to the merits of the claim, the claim is barred by collateral estoppel. Appellant acknowledges that this precise issue was raised in his 1996 appeal featuring the same parties, and this Court, remanding for a new trial based on a different trial court error, necessarily concluded that the Double Jeopardy Clause did not preclude a new trial. Even were this Court to reconsider the merits, the claim still fails because there is no evidence that the mistrial was caused by prosecutorial misconduct. Instead, all the evidence points to the fact that the failure to endorse witnesses was merely inadvertent. The point is denied.

### 15.

 Finally, appellant claims that "[t]he trial court plainly erred in imposing a sentence of death because the method of execution prescribed by Missouri Law constitutes cruel and unusual punishment...." This claim, however, is not properly raised for the first time on direct appeal from his conviction. Until appellant is actually ready to be subjected to a certain protocol to carry out his execution, his claim is premature. *Worthington v. State*, 166 S.W.3d 566, 583 n. 3 (Mo. banc 2005).

### III.

For the foregoing reasons, the judgment is affirmed.

PRICE and RUSSELL, JJ., and EVANS, Sp.J., concur.

WOLFF, J., dissents in separate opinion filed.

STITH, C.J., and TEITELMAN, J., concur in opinion of WOLFF, J.

BRECKENRIDGE, J., not participating.

MICHAEL A. WOLFF, Judge, dissenting.

It has been 16 years since the brutal killing of Gladys Kuehler and the arrest of Walter Barton. From the first mistrial in 1993 through three completed trials, post-conviction proceedings, multiple appeals, there is a trail of mishaps and misdeeds

that, taken together, reflect poorly on the criminal justice system.

There are three questions at this stage of the proceedings:

1. Is there sufficient evidence for a jury to convict Barton of capital murder?

2. If the evidence is sufficient to support a murder conviction, should the sentence of death remain intact after this Court's review under sec. 565.035 [1]?

3. Was the state's conduct that prompted the mistrial of the first trial of this case in 1993, along with its subsequent conduct, sufficient to invoke the double jeopardy protection that would bar subsequent prosecution of Barton? Remarkably, through all the proceedings in this case, that issue has never been addressed by this Court.

Before getting to these points, a brief review of the procedural history is in order.

Gladys Kuehler was brutally stabbed to death in her trailer at Riverview Trailer Park in Ozark, Missouri, in the afternoon of October 9, 1991. Present when the body was discovered were Ms. Kuehler's granddaughter, Debbie Selvidge, a neighbor, and the defendant Walter Barton. Barton ultimately was charged with the killing.

The state's case against Barton proceeded to trial in April of 1993. Shortly after the trial began, the defendant objected that the state had failed to endorse any trial witnesses. The judge ruled that the trial could not proceed and granted a mistrial at the request of the defendant Barton.

A second trial began in October 1993. After a several day trial, the jury deadlocked on whether or not Barton was guilty, and the trial judge declared a mistrial.

Barton was brought to trial again in April 1994. He was convicted and, following the jury's recommendation, was sentenced to death. The appeal of that conviction resulted in reversal by this Court due to improper rulings on objection of the defendant to the prosecution's final argument. 936 S.W.2d 781 (Mo. banc 1996).

Barton was brought to trial again, in June 1998, following the reversal of the conviction in December 1996. He was convicted and, upon the jury's recommendation, was sentenced to death. The conviction and death sentence were affirmed by this Court; State v. Barton, 998 S.W.2d 19 (Mo. banc 1999). I wrote a dissent on the basis that the prosecution had given information to a local newspaper that supplied a motive for the killing, which was not in evidence, and which had been read by most of the jury venire prior to trial. See Barton, 998 S.W.2d at 30–32.

Following the affirmance of the conviction and death sentence, Barton brought a motion under Rule 29.15 for post-conviction relief, alleging various irregularities and constitutional violations in his trial. This Court remanded the denial of post-conviction relief to the trial court in an opinion published at Barton v. State, 76 S.W.3d 280 (Mo. banc 2002). In addition to remanding for new findings of fact and conclusions of law, this Court ordered that the case be transferred to another judge. In January 2005, the new judge, John W. Sims, ordered a new trial on both the guilt phase and the death sentence. Judge Sims found that the prosecution had failed to disclose the full criminal history of a jailhouse snitch witness, a woman of many aliases referred to as "Katherine Allen." Judge Sims found that the state had failed

1. All references are to RSMo 2000.

to disclose that the prosecutor had agreed to have a Cass County forgery case against "Allen" dismissed in exchange for her testimony in the Barton trial. Judge Sims also granted relief on Barton's assertion that the state had knowingly used perjured testimony by "Allen." The state did not appeal Judge Sims's order granting a new trial.

Following his post-conviction order Judge Sims recused himself and the current judge was appointed to hear the case.

The case came to trial, for the fifth and most recent time, in March 2006. The jury found Barton guilty and recommended the death sentence, which the trial court imposed. This appeal follows.

The facts in this case, which have been adduced in the various trials including the most recent one, are summarized in the principal opinion and in this Court's previous opinions. They can be referred to here, in summary fashion.

The evidence is certainly not overwhelming. The state has, over the years, bolstered its rather meager case with evidence of the jailhouse snitch, as well as "blood spatter" expert testimony. The one thing that can be said for sure about Walter Barton is that he may well be the only person known to have been in the neighborhood on October 9, 1991, who might have done such a thing.

The evidence that links Barton to the crime is not particularly compelling.

### 1. Is the evidence sufficient to support a murder conviction?

Taking the evidence in the light most favorable to the jury's verdict, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence supporting Barton's conviction is much as the majority has characterized it. However, I would like to identify the most glaring inadequacies in that evidence. At trial,

the state emphasized the check that was found several days after Ms. Kuehler's body was discovered, stressing that the check had not been entered in Ms. Kuehler's check registry, as was her usual practice. Barton has never denied receiving a check from Ms. Kuehler. If anything, the existence of that check simply reinforces Ms. Horton's testimony that Barton intended to go to Ms. Kuehler's trailer around 3 p.m. to pick up a check. Further, there is no eyewitness testimony placing Barton in Ms. Kuehler's trailer at the time of the attack.

At trial, a so-called "blood splatter expert" testified that the victim was stabbed numerous times, generating "high-impact" blood splatters. That same expert testified that the stains on Barton's shirt were consistent with a forceful impact wound. Based on the expert's testimony regarding the "high-impact" blood splattering, and the fact that Ms. Kuehler was stabbed numerous times, one would reasonably expect the victim's assailant to be covered in blood. However, the only blood found on Barton by one of the examinations was the stain on his shirt. If there were blood stains on Barton's boots, they apparently were small enough to be obliterated by subsequent DNA testing. There were two small stains on his jeans, which were never positively identified as being Ms. Kuehler's blood.

There was no testimony at trial that Barton changed clothing or discarded the clothing he had worn to go and visit Ms. Kuehler. How could Barton have perpetrated the kind of violent, forceful attack that killed Ms. Kuehler and walked away quite unstained by the effort?

Barton provided an explanation for the blood on his shirt. He told investigative officers that he had gotten blood on his shirt when he bent down to pull Ms. Selvidge away from the victim's body. The

sink, soap and towel Barton had used to wash his hands in Ms. Horton's trailer were all tested for blood, but none was found. The bloodstain on Barton's shirt is the *only* physical evidence in any way connecting him to this crime, and that evidence is highly suspect at best.

The state points to the testimony of Carey Maloney, a DNA expert who works for the Missouri State Highway Patrol Crime Laboratory. Ms. Maloney testified that she was "able to determine that there was human blood" on Barton's blue jeans, and that she was "able to determine that human blood was present on the boots." However, William Newhouse, also a state's expert witness, testified that he "found no blood whatsoever on the boots" and that although the stains on the jeans had the "appearance of blood," he had not performed any tests on those stains to confirm that they were blood. Even if we assume that Ms. Maloney's testimony was accurate, and that the stains on the jeans were blood, there is no evidence identifying the source of the supposed "blood" stains on the jeans. At best, these contradictions and gaps in the state's evidence call the validity of that evidence into question, and at worst, they render the only physical evidence in this case utterly inconclusive.

The testimony of "Katherine Allen," a jailhouse snitch, provided the only evidence of an alleged "admission" made by Barton. "Allen" testified that Barton threatened that he would "kill her like he killed that old lady." "Allen" is a convicted felon whose crimes have all involved dishonesty, including fraud, forgery, conversion and the use of aliases. Also relevant to an evaluation of the credibility of her testimony is the fact that the state agreed to drop a pending charge against her in exchange for her testimony against

Barton. This agreement was not disclosed to the defense and was a reason Judge Sims ordered a new trial in January 2005. "Allen's" testimony strains credulity and cannot be considered persuasive evidence of an admission by Barton.

Even if the majority may deem this evidence adequate to support a conviction, the strength of that evidence to support the application of the death sentence is another matter.

**2. If the evidence is sufficient to support a murder conviction, should the sentence of death remain intact after this Court's review under sec. 565.035?**

Section 565.035[2] provides that "[w]henever the death penalty is imposed in any case, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the supreme court of Missouri." As a part of this review, this Court must determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." Section 565.035.3(3). This Court noted in *State v. Chaney* that the "strength of the evidence" component of the proportionality review "is uncommon among states having statutes mandating proportionality review. It is clear from this mandate that the legislature intended for this Court, when reviewing the imposition of the death penalty, to go beyond a mere inquiry into whether the evidence is sufficient to support a conviction." 967 S.W.2d 47, 59 (Mo. banc 1998). Such a sufficiency review is necessary here.

Barton invokes *Chaney* and argues that the evidence of his guilt is insufficient to support the imposition of the death penalty. The majority summarily dismisses this

---

**2.** All references are to RSMo 2000.

argument, saying only that "... the circumstantial evidence was strong, placing appellant alone at the scene of the crime and establishing that the victim's blood was spattered on appellant's clothing." The majority conducts a more thorough discussion of evidentiary sufficiency in the context of Barton's first point on appeal—that the evidence was insufficient to support a conviction. The majority describes that evidence as follows: "The victim's blood was found on appellant's clothing the night of the murder, and a blood spatter expert testified that some of the blood stains were created by the 'forceful ejection' of the victim's blood in appellant's presence. In addition, appellant made inconsistent statements to the police, telling them that the last time he saw the victim was at her trailer between 2:00 and 2:30 on the day of the murder, though he later admitted that he received the telephone call from Bill Pickering in the victim's trailer, which was made at 3:15, well after appellant originally said he had left. His mood change before and after the murder, the undue time he spent at the sink in Horton's bathroom, his statement to Horton not to go to the victim's trailer, and his insistence that Selvidge not go down the hallway, are all further indications of guilt. Also, the discovery of the disposed-of check, which had been made out to appellant, but had not been entered in the check register, is an indication that appellant tried to rid himself of evidence tying him to the murder. Finally, there was evidence that appellant admitted the crime when Katherine Allen testified that appellant threatened to kill her 'like he killed that old lady.' But even without that admission, the evidence of guilt was more than sufficient to support the verdict."

None of the evidence cited by the majority is direct evidence of Barton's guilt. In *Chaney*, this Court overturned the trial court's imposition of the death penalty,

finding that the case fell "within a narrow band where the evidence is sufficient to support a conviction, but not of the compelling nature usually found in cases where the sentence is death." 967 S.W.2d at 60. In finding that the evidence was insufficient to warrant the imposition of the death sentence, the Court cited the "primarily ... trace and pathological" nature of the evidence, noting the absence of "eyewitness, confession, admission, document, fingerprint or blood evidence directly pointing to the defendant." *Id.*

In *Chaney*, there was substantial physical evidence, including hair and fiber samples indicating that the victim had been present in the defendant's van the day she was murdered. 967 S.W.2d at 51–52. Investigators also discovered an "awl-like tool consistent with [the victim's] wounds ... in a tire repair kit" in the defendant's tool box. *Id.* at 51. However, the *Chaney* Court deemed this evidence "not of the compelling nature usually found in cases where the sentence is death." *Id.* at 60. The evidence in *Chaney* was arguably much more damning than that admitted against Barton, and still the Court found that evidence insufficient to warrant imposition of the death penalty.

As was the case in *Chaney*, here there is no eyewitness testimony or confession. As discussed above, the only evidence of a so-called "admission of guilt" came from the testimony of "Katherine Allen," a jailhouse snitch witness who has been convicted of six bad check charges, one count of escape, ten counts of forgery, ten counts of theft, one count of conversion and one count of credit card fraud. In exchange for "Allen's" testimony against Barton, the prosecutor dismissed an additional pending charge of forgery, a fact that the prosecution did not disclose until after the second trial of this case. "Allen's" testimony concerning Barton's alleged statement that he

had "killed that old lady" does not constitute credible evidence of an admission.

There were only two pieces of physical evidence connecting Barton to the victim. The first was the blood splatter on Barton's sleeve. Although the state's expert William Newhouse testified that the splatter was consistent with impact with the victim's body, Barton provided an alternate explanation for the stain. The night Ms. Kuehler's body was discovered Barton explained the blood on his sleeve to Officer Jack Merritt, saying that his sleeve had grazed the bloody floor of the trailer when he bent over Ms. Selvidge, who was kneeling next to the body. In an interview with Officer Merritt that night, Ms. Selvidge confirmed that Barton had pulled her from the body. At trial, Ms. Selvidge altered her story, testifying that Barton had never entered the bedroom where the body lay. Because of the alternate explanation for the stain and the inconsistencies in Ms. Selvidge's account, the blood splatter does not indisputably tie Barton to the crime.

The other piece of physical evidence presented at trial was a check for $50 dated the day of the murder, October 9, 1991, made out by Ms. Kuehler to Barton. The check was discovered in a ditch three days after the murder. The state stresses the significance of the fact that the check was never entered into the Ms. Kuehler's checkbook. This evidence is circumstantial and does not necessarily implicate Barton in this crime. Further, at trial, the state admitted evidence of a hair found on Ms. Kuehler's stomach. The hair was never identified but was found to be inconsistent with the hair sample taken from Barton. When taken together with the dubious physical evidence supposedly implicating Barton, evidence of the unidentified hair casts yet more doubt on the sufficiency of the physical evidence.

Barton's supposed changes in mood, statements made upon the discovery of the body and the disparities in the exact times given in his accounts to police officers hardly rise to the level of direct evidence discussed in *Chaney*. In fact, similar evidence was admitted to the *Chaney* trial court, including logical gaps in the defendant's alibi and his distracted, sorrowful demeanor upon questioning by police officers. 967 S.W.2d at 50. This evidence was insufficient to convince the Court to uphold the application of the death penalty.

Even if the evidence presented at trial had been substantially stronger, the procedural history of this case alone should give this Court pause in determining the appropriateness of a death sentence. Barton has gone to trial five separate times for the same offense. In the evidentiary hearing on Barton's Rule 29.15 post-conviction motion, the trial court stated:

"I find clearly, clearly, that the Defendant has been prejudiced by having to come back over and over again because clearly the State's case has been improved time after time because they find more snitches. They find two things I think most important. They find more snitches, and they get the benefit of technological advantages and DNA, none of which they had. The only time the jury got to hear a fair crack and then the jury was hung. So it is almost unarguably [sic] that the Defendant has been prejudiced. The defendant has been prejudiced."

Prosecutorial misconduct has plagued Barton's trials from the outset, and, as the motion court observed in 2005, has allowed the state numerous opportunities to bolster its evidence. Whether the prosecutor's conduct may or may not rise to the level of intentionality required to invoke the double jeopardy protection of *Oregon*

*v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), it should certainly factor into this Court's consideration of the strength of the evidence in its proportionality review. At Barton's first trial, a mistrial was declared as a result of the prosecution's failure to endorse witnesses on the indictment as required by Rule 23.01(f). Barton's second trial resulted in a hung jury, a clear indication that the evidence presented by the state was insufficient to convince all the triers of fact beyond a reasonable doubt.

In the third and fourth trials, the state used the testimony of the "snitch" witness "Katherine Allen." The post-conviction court determined that the prosecutor had failed to disclose "Allen's" complete criminal history, a disclosure that would have allowed the defense "to conduct a far more effective cross-examination of 'Ms. Allen.'" Following the fourth trial, the defense learned that the state had also failed to disclose that a deal had been made with "Allen" in exchange for her testimony against Barton. But even after the findings of the post-conviction court, during Barton's fifth trial, the prosecutor still elicited inaccurate testimony from "Allen" concerning her criminal record.

Beyond these clear-cut examples of prosecutorial misconduct, the simple fact is that the numerous reversals and errors in this case have allowed the state years and years in which to build its case. The protracted nature of this process undoubtedly compromised Barton's ability to mount an effective defense. In *voir dire* for Barton's fifth trial, four prospective jurors said that because the state has spent so much time prosecuting Barton, they found it difficult to believe he was innocent.

Brenda Montiel, one of Barton's alibi witnesses, is now dead, and only her prior testimony was available to him at the time of his fifth trial. Susan Strahan, a state's witness, had died by the time of Barton's fifth trial, and, so, a transcript of her testimony in a previous trial was read into the record. Defense counsel objected that the state had failed to disclose lineup photographs that were used in an interview with Ms. Strahan prior to her testimony. Because the state could not produce evidence that they had disclosed the lineup photographs to the defense, the court allowed in the testimony, provided all references to the lineup photographs were redacted. The defense had no way to cross-examine Ms. Strahan to determine whether her identification had been tainted by the undisclosed photo lineup, since the defense was not made aware of the earlier identification in time to cross-examine Ms. Strahan in person.

This kind of unfairness may not, in isolation, have prejudiced Barton. But taken in light of all of the other evidentiary inadequacies and misconduct by the state, there can be no question that Barton's right to a fair trial has been jeopardized irreparably.

Section 565.035 allows this Court the flexibility to determine whether a defendant genuinely merits the most severe sentence this state has the power to impose. The existence of the "strength of the evidence" clause of section 565.035.3(3) evidences a desire by the legislature for this Court to engage in a review of a defendant's case, consisting not just of single points of law, but of the total impression of the justness and equity of imposing the death penalty. In Walter Barton's case, as was the case in *State v. Chaney,* the absence of direct evidence and the numerous opportunities given the state to build its case render the application of the death penalty unjust.

### 3. Does the prosecutorial misconduct in this case warrant Oregon v. Kennedy double jeopardy protection?

*Oregon v. Kennedy* establishes that "where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial, [the defendant] may . . . raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). This rule aims to prevent prosecutors from gaining more time to build a case by provoking the defendant to seek a mistrial. As the majority in this case observes, the key inquiry in an Oregon analysis is whether or not the prosecutor *intended* to incite the defendant to request a mistrial. *See Oregon*, 456 U.S. at 675, 102 S.Ct. 2083 (". . . a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply."). The majority hinges its rejection of Barton's double jeopardy argument on the intent question, arguing that "[t]he record simply does not support the conclusion that the prosecutor intended to prevent an acquittal, and for that reason, the Double Jeopardy Clause does not prevent retrial of the case."

While the majority may be correct that the state's failure to fully disclose either "Katherine Allen's" criminal record or the existence of a deal made in exchange for her testimony does not demonstrate intent to provoke a mistrial, the majority overlooks an additional relevant instance of prosecutorial misconduct. There are at least *two* points in the complicated procedural history of this case that require an examination of the appropriateness of applying *Oregon v. Kennedy* double jeopardy protection to Walter Barton.

In Barton's first trial in April of 1993, the prosecution failed to endorse any wit-

nesses, even after the jury had been sworn. This failure prompted the defense to move for a mistrial. After the trial court granted the mistrial, defense counsel moved to discharge Walter Barton on double jeopardy grounds. The trial court ruled that the defendant's request for a mistrial waived any double jeopardy claim. Defense counsel's request for a mistrial, rather than a discharge, was brought up on appeal as an ineffective assistance of counsel claim after Barton's conviction in the third trial. This Court did not rule on the ineffective assistance of counsel issue and instead reversed the conviction because of the trial court's improper rulings on objections raised by the defendant to the prosecution's final argument. 936 S.W.2d 781, 788 (Mo. banc 1996).

Counsel for the defendant also raised the ineffective assistance/double jeopardy issue in the amended motion to vacate judgment and conviction submitted to the trial court for the Rule 29.15 post-conviction hearing. In its findings of fact and conclusions of law, the motion court found that "while no witnesses were endorsed by the State on the information, discovery had been conducted in the case and trial counsel was not surprised by the State's evidence. The Court would have allowed the state under those circumstances to endorse witnesses and Movant is incorrect in concluding that his discharge was the only remedy." The court denied the claim. The language of the court's finding implicitly addresses the question of prejudice, asserting that because the first trial court would have allowed the state to endorse witnesses, Barton was not prejudiced by the state's error. While prejudice is a prong of an ineffective assistance of counsel claim, it has no bearing on an *Oregon v. Kennedy* double jeopardy analysis.

No court at any stage of the proceedings in this case has ever conducted an exami-

nation of the prosecutorial intent behind the state's failure to endorse witnesses in the first trial. Indeed, in denying the defense's request for discharge, the April 1993 trial court completely disregarded the protections afforded defendants by *Oregon v. Kennedy*. The trial court ruled that because Barton requested a mistrial, he could not receive protection of double jeopardy. This ruling not only fails to evaluate the intent underlying the state's error, it undermines the principle at the very heart of *Oregon v. Kennedy*.

Barton has preserved this claim for evaluation in a Rule 29.15 hearing by raising his request for double jeopardy protection first at the trial, then at the appeal from his conviction following the third trial, then in his amended motion submitted to the Rule 29.15 motion court and finally, in his brief before this Court. This Court now has the opportunity to remand this case for a finding as to the intent of the prosecutor consistent with *Oregon v. Kennedy*.

To do so would not require an extension of *Oregon v. Kennedy*, but merely an application of its protections in their most conservative form. As the Rule 29.15 motion court observed in 2005, "... the Defendant has been prejudiced by having to come back over and over again because clearly the State's case has been improved time after time because they find more snitches." It is *this very situation* that the United States Supreme Court sought to prevent in *Oregon v. Kennedy* by applying the Double Jeopardy Clause to retrials following mistrials induced by prosecutorial misconduct. If Barton's case does not merit a hearing on this issue, then the protections of *Oregon v. Kennedy* are hollow indeed.

## Conclusion

In order to reach its result, the majority of the Court must not only overlook the protection of the Double Jeopardy Clause, but it also must imagine that the evidence is better than it is. The Court must imagine that "Katherine Allen" is telling the truth. The Court must also imagine that the prosecution did not attempt to suborn perjured testimony of the other jailhouse snitch, Larry Arnold, who recanted his previous trial testimony regarding Barton's supposed admissions. The Court must imagine that a check made out to Barton and found miles away from Ms. Kuehler's trailer days after the crime somehow constitutes evidence of motive or an admission of guilt or an attempt to conceal evidence. The Court must imagine that witness testimony placing Barton in Ms. Kuehler's trailer for a brief period of time at some point on the day of the murder is sufficient to implicate Barton as the murderer. The Court must imagine that after repeatedly and violently stabbing Barton, Barton walked away from the crime with two small bloodstains on his shirt and little or no blood on his boots. The Court must imagine that this blood evidence means something more than it does.

I can imagine why the Court would affirm the conviction of Walter Barton. After all, at least 36 of the 48 jurors who have heard the evidence—tainted though it may be—have voted to convict. If this were not a criminal trial, that would be a landslide.

I cannot imagine, however, why the Court would approve the death sentence on this sorry record.

I respectfully dissent.